[No. S016072. Crim. No. 25311. Jan. 23, 1992.]

In re GONZALO MARQUEZ MARQUEZ on Habeas Corpus.

588

## COUNSEL

Eric S. Multhaup, under appointment by the Supreme Court, and Kathy M. Chavez for Petitioner.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, John R. Gorey, Christine C. Franklin, Mark Alan Hart and Sharlene A. Honnaka, Deputy Attorneys General, for Respondent.

## OPINION

PANELLI, J.—Petitioner was convicted of the second degree murder of Angel Rodriguez and the first degree murder of Ascencion Hernandez with three special circumstances (multiple murder, murder during the commission of robbery, and murder during the commission of burglary). Petitioner was also convicted of first degree burglary and robbery of Hernandez with the use of a firearm. After a half-hour penalty trial in which neither side presented evidence, the jury returned a death verdict. Petitioner's automatic appeal has been considered, and our opinion affirming the judgment of guilt is being filed simultaneously with this opinion.

Petitioner filed a petition for writ of habeas corpus alleging that he was denied the effective assistance of counsel at both the guilt and penalty phases of his trial. Petitioner alleged that trial counsel had failed adequately to

investigate whether he was still a juvenile when the murders were committed, failed adequately to investigate petitioner's claim that he was in Mexico in 1981 when Ascencion Hernandez was killed, failed adequately to argue the motion challenging the validity of petitioner's arrest, and failed to investigate or present mitigating evidence. We issued an order to show cause and appointed the Honorable Charles Hughes, retired judge of the Los Angeles Superior Court, as our referee to take evidence and make findings of fact on nine specific questions relating to the adequacy of counsel's investigation.[1] Judge Hughes heard testimony, received exhibits, and submitted a report with extensive findings of fact. His report recommends that petitioner be given a new trial on all charges. As we shall explain, we agree with the recommendation that petitioner be given a new penalty trial, but we do not agree that a new trial on guilt is warranted.

## EVENTS LEADING TO PETITIONER'S CONVICTION

### 1. *Murder of Angel Rodriguez*

On December 31, 1979, El Monte police responded to a call and found the body of Angel Rodriguez lying on the sidewalk. He had been shot in the head with a 9-millimeter handgun. Police questioned four Spanish-speaking individuals who lived nearby. They gave the police descriptions, names and nicknames of two suspects. The witnesses also helped develop composite drawings of the suspects. An arrest warrant for petitioner was obtained as a result of the information given. None of these witnesses could be located to testify at trial.

### 2. *Murder of Ascencion Hernandez*

On March 15, 1981, about 10:30 p.m., Connie Hernandez was in her bedroom; her husband, whose nickname was "Chon," was in the living room watching a television program. Connie heard voices in the living room, speaking Spanish, and someone saying "Chon, Chon." She peeked out and saw two men pointing guns at her husband. Connie put on her robe, ran into the living room and stood between her husband and the two men with the guns, facing the latter. At that point another man ran through the front door, put a knife to Connie's stomach, and told her to be quiet. While face to face with the gunmen, Connie was crying and screaming in Spanish, begging them not to do anything. She testified that petitioner was one of the two gunmen and that he did most of the talking. Petitioner was described as wearing a beanie (knit ski cap) covering his hair and ears; the other gunman

---

[1] We submitted no questions concerning petitioner's arrest because the return and traverse disclosed no disputed issues of fact relevant to that matter.

wore no hat or mask; and the person holding the knife wore a beanie that covered his face and had holes for his eyes. The gunmen demanded money from Hernandez and threatened to kill him. When one of the babies started crying, Connie told the men in Spanish that she was going to her daughter's room to tell her to get medicine for the baby. The man with the knife followed her. She knocked on the door and, in English, told her daughter Sandra to go out the window and ask the neighbors to call the police because there were three men there who wanted to kill her husband. (The men did not understand English.) Connie returned to the living room and again positioned herself between the gunmen and her husband. Petitioner was still demanding money. Finally, her husband said he would give them all the money he had, took about $140 to $150 from his wallet, and threw it on the floor. Connie ran into the kitchen, heard shots, returned to the living room, and found her husband lying in blood.

Connie estimated that she looked at petitioner for five minutes. She said his nose was pointed and that his eyes were big and round. There was adequate lighting; the overhead light was on in the kitchen, as was a lamp on top of the television.

Sandra de la Fuente testified that her mother's screaming awakened her; she opened the door and saw a masked man standing next to her mother, holding a knife on her. As her mother went toward the bathroom, Sandra walked a little way up the hallway and saw petitioner pointing a gun at her stepfather. Her mother told her to go back to her room, lock the door, and go through a window to call the police. Sandra had a good look at petitioner and heard him ask her stepfather for money.

Tina de la Fuente was awakened by her mother's screaming, went into the hallway, and saw petitioner pointing a gun at her stepfather. She looked at him for about a minute and returned to her room. She did not see any other intruders. In particular, she remembered petitioner's long nose.

Petitioner was identified by each of the three eyewitnesses—Connie, Sandra, and Tina. Each separately identified petitioner from a live lineup and at trial. Each testified that she recognized petitioner as soon as he entered the lineup area. Although Connie had been unable to identify petitioner in a group of photographs shown her, she had told the officer that she could not make an identification from a photograph but that she thought that she would recognize the perpetrator in a live lineup. Neither Sandra nor Tina had been shown any photographs.

An autopsy revealed that Ascencion had been shot six times with a 9-millimeter handgun and three times with a .38-caliber automatic. The 9-millimeter handgun was not the same gun that was used in the killing of Angel Rodriguez.

### 3. *Petitioner's Arrest and Confession*

Petitioner was arrested at his residence by El Monte police around 1 a.m. on December 12, 1981. Petitioner's brother Amelio and petitioner's girlfriend Martina Pereida were also arrested and placed in custody on charges unrelated to the murder. At a pretrial Evidence Code section 402 hearing petitioner testified on cross-examination that at the time of his arrest he was in the shower, with no water running, and wearing pants and shoes. At trial, however, he testified that he did not remember saying that and asserted that he remembered only that he was in the bathroom and was wearing pants.

On December 14, 1981, petitioner was interviewed by Detective Johnston of the El Monte police, who was investigating the 1979 murder, Detective West of the Los Angeles Sheriff's Department, who was investigating the 1981 murder, and Detective Parrott of the El Monte police, who was interpreting for the other two. Detective Parrott had spoken Spanish at home since the age of 10 and had studied it in high school and college. Detective Parrott was familiar with the vernacular used by petitioner and many other Spanish-speaking people in El Monte. Detective Parrott advised petitioner of his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) in Spanish from a Spanish-language rights card. Petitioner appeared to understand what Detective Parrott said and his answers were responsive to her questions; he seemed relaxed and cheerful. Detective Parrott testified that no promises or threats were made to petitioner or to any member of his family; petitioner's answers appeared to have been freely and voluntarily given. Detectives Johnston and West confirmed this. Detective Parrott asked questions formulated by Detectives Johnston and West; she had little independent information about the crimes. Pursuant to departmental policy, the interview was not tape-recorded.

Petitioner admitted complicity in both murders. When he was asked about a man who had died on December 31, 1979, petitioner first said he was not in the country at that time. He then admitted shooting the man after being told that there were witnesses who could identify him. Petitioner said his cousin Mario had been fighting with the victim on Merced Street in El Monte. Mario told petitioner to shoot the victim, so petitioner shot him in the head with a blue steel automatic weapon.

When asked about the death of Ascencion Hernandez on March 15, 1981, petitioner said he was there but that he did not kill him. Petitioner said he was there with Miguel Reyes (known as "La Gusia") and Jaime Polido (known as "Chu Cho" or "Chu Chi"). They lived in neighboring apartments.

Petitioner described how Miguel drove him and Jaime in Miguel's yellow Mustang to Chon's house about 10 p.m. (Miguel knew Chon from Mexico.)

Miguel and Jaime had automatic weapons and petitioner had a knife; Miguel was wearing a beanie that was pulled down to cover his face. When they went inside the house, petitioner heard a lady talking in English and he thought there was a little girl there. The lady came into the room. The victim was watching television. Jaime called the man Chon and told him to give them the money. The man said he did not have it there. Petitioner said that Jaime and Miguel were doing the talking; he was standing by the door. Petitioner did not see the shooting, but he heard three or four bullets. Petitioner described Miguel as five feet eleven inches tall, heavyset, brown eyed, and having almost shoulder-length brown hair. He described Jaime as five feet two inches tall, chubby, with dark eyes and very dark, curly hair.

### 4. *Defense Case*

Petitioner testified at trial as well as at the pretrial Evidence Code section 402 hearing. He denied involvement in either the 1979 or 1981 shooting. He said he was living in his family home in El Pilon, Mexico, until he came to California in 1980. He did not remember specifically when he arrived. He returned to Mexico in 1980, and came back to California about September 1981. Petitioner said that he was in Mexico at the time of the Hernandez killing and that he had been at Dr. Godinez's clinic in Buena Vista, Mexico from March 13 through March 17, 1981, as the doctor had testified. Petitioner did not know what was wrong with him or exactly when he had been hospitalized. Petitioner said he confessed because his wife was pregnant and in custody, and he was afraid that she would have a miscarriage. Petitioner said he answered "yes" to whatever Detective Parrott said and that he did not understand everything she said because he did not understand her Spanish.

Martina Pereida, petitioner's girlfriend, testified that she went to Mexico with petitioner in the last part of 1980 and stayed about one year. She testified that she remembered that petitioner had been in the hospital for four or five days in March 1981. She remembered the date because she had had a miscarriage then as a result of falling off a horse. Martina remembered being arrested and said she had difficulty understanding Detective Parrott's Spanish. She testified that she had been back in the United States about a month and a half when they were arrested on December 12, 1981. On cross-examination Martina testified that she returned to the United States with petitioner. She acknowledged that a medical record indicated she had had a prenatal examination in California on August 27, 1981. When called as a rebuttal witness, Martina said that she knew a person by the name of "La Gusia" in El Pilon, Mexico.

Petitioner's sister, Ana Maria Llamas, testified that she paid for petitioner to come to the United States in the first part of 1980 and that he lived with

her and her husband. Petitioner left for Mexico with Martina in August, September, or October of 1980 and was gone for about a year. Petitioner had been back in the United States about two to three months when he was arrested in December 1981. On cross-examination Ana Maria acknowledged that she had an uncle named Mario Marquez Marquez. When petitioner wanted to return to the United States, he called Ana Maria collect and asked her to help him pass over the border. She did not, however, have any telephone records to verify the date of the call.

Dr. J. Jesus Godinez Gonzalez testified that he had a medical practice in Buena Vista, a neighboring community of El Pilon, and that he had been the family doctor for the Marquez family. Dr. Godinez treated petitioner for a parasitic liver infection on March 13, 1981. He testified that petitioner had stayed at his clinic for four or five days, from March 13 to March 16 or 17, 1981. He remembered the incident because of the infrequency of seeing cases of parasitic liver disease and because he regularly gives patients a handwritten prescription with the date of consultation on it. Dr. Godinez kept no medical records because his clients could not afford to pay him for the time that requires. At the request of petitioner's parents, Dr. Godinez had executed an affidavit stating that he had examined petitioner on March 13, 1981, and had kept him in his clinic until March 17, 1981.

On cross-examination, Dr. Godinez stated that his affidavit giving the dates of treatment was based on the dates given in the prescription that petitioner's father had shown him in January 1982. He returned the prescription to petitioner's father and has no copy of it. Dr. Godinez acknowledged that he had told the district attorney's investigator and Mexican police officers that he did not independently know the exact date on which he treated petitioner.

### 5. *Jury Arguments*

The prosecutor's argument was primarily an attack on the credibility of the defense alibi witnesses. The prosecutor attacked the testimony of Dr. Godinez, pointing out that although Dr. Godinez said he based his affidavit on the earlier prescription, he did not attach a copy of the prescription to the affidavit and the prescription now cannot be found. The prosecutor suggested that the prescription, if it existed, might originally have read March 7 and might have been altered to read March 17. The prosecutor described the other defense alibi witnesses as "myna birds, programmed to say certain things and nothing more." He noted that petitioner, his girlfriend, and his sister told their stories, but then could not recall or did not understand questions on cross-examination. Petitioner even claimed not to know the seasons of the year, and he grew up on a farm.

The defense argument presented by Marcia Brewer reviewed the jury instructions and emphasized the instruction on eyewitness identification. She noted the danger of misidentification and suggested that the witnesses to the 1981 killing were mistaken in their identification of petitioner. Defense counsel argued Dr. Godinez's credibility, lack of bias, and the danger of trying to impose American recordkeeping standards on people who do not even have electricity or running water.

The penalty phase arguments were brief, since no evidence had been presented at the penalty phase. The prosecutor argued that petitioner deserved the death penalty for the cold-blooded nature of the shooting of Hernandez and the need to protect society from such persons. The prosecutor likened petitioner to a poisonous snake which though harmless in appearance is, in fact, deadly.

The defense argument by Fred de la Pena began by stating: "Purposely we elected not to present evidence having to do with his family because we presented that at the guilt phase. There is nothing more that I could add." Defense counsel then reviewed the statutory factors, but he did not argue for viewing them in petitioner's favor. He viewed the absence of evidence of victim participation as aggravating, contrary to our decision in *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861], which was not filed until after this case was tried. Counsel argued for life without possibility of parole, but his argument was not particularly forceful.

HABEAS CORPUS PROCEEDINGS

1. *The Reference Order*

Our reference order directed the referee to take evidence and make findings on nine questions:

"(1) What action was taken by trial counsel to obtain and present evidence concerning defendant's age at the time of the murders for which defendant was convicted?

"(2) What further action, if any, would competent counsel have undertaken to obtain and present evidence concerning defendant's age?

"(3) Was defendant denied his right to competent representation of counsel by reason of counsel's failure to undertake further action to obtain and present evidence concerning defendant's age?

"(4) What action was taken by trial counsel to obtain and present evidence concerning defendant's whereabouts on March 15, 1981, the date of the murder of Ascencion Hernandez?

"(5) What further action, if any, would competent counsel have undertaken to obtain and present evidence concerning defendant's whereabouts?

"(6) Was defendant denied his right to competent representation by counsel by reason of counsel's failure to undertake further action to obtain and present evidence concerning defendant's whereabouts?

"(7) What action was taken by trial counsel to obtain and present mitigating evidence at the penalty phase of defendant's trial?

"(8) What further action, if any, would competent counsel have undertaken to obtain and present mitigating evidence at the penalty phase?

"(9) Was defendant denied his right to competent representation of counsel by reason of counsel's failure to undertake further action to obtain and present mitigating evidence at the penalty phase?"

We did not order a reference with respect to petitioner's claim that his counsel did not adequately argue the motion to suppress the evidence, including petitioner's confession, that was derived from an allegedly illegal arrest. The validity of the arrest and the question of suppression of petitioner's confession as a product thereof is discussed at length in the appeal. Petitioner asserts that the trial court apparently was unaware that the arrest warrant relied upon in its ruling was for a different Gonzalo Marquez and argues that defense counsel should have corrected that misconception. Suffice it to say that the record does not support petitioner's assumption that the trial court was unaware that the erroneously recalled arrest warrant was for a different Gonzalo Marquez. Accordingly, this claim of ineffectiveness of trial counsel fails.

2. *General Findings of Fact Regarding Attorney de la Pena's Representation in This Case*

After preliminary findings reciting the appointment of de la Pena and Brewer, with de la Pena as primary counsel, the referee noted that de la Pena knew from the outset that the critical evidence on alibi, age, and mitigation would probably be located in El Pilon. The referee made findings regarding counsel's investigative efforts in Mexico.

The referee found that only one investigative trip by Attorney de la Pena or anyone acting under his direction was made to the El Pilon region between the time of counsel's appointment and the commencement of trial. This trip was made by de la Pena and investigator Mendoza and consumed

eight days and seven nights. Five of those seven nights were spent in the El Presidente Chapultepec Hotel in a scenic suburb of Mexico City, one in the resort town of Patzcuaro between Mexico City and El Pilon, and one in the vicinity of El Pilon. Only two days were spent in the El Pilon area investigating birth records and interviewing petitioner's family and doctor. They spent a total of 20 to 25 minutes at petitioner's home in El Pilon and interviewed petitioner's parents at a nearby hotel for an hour or two. De la Pena arranged for follow-up contacts with the parents by having Ana Maria Llamas, petitioner's sister in Los Angeles, call Elena, the sister in Los Reyes, who in turn would relay a message to the parents.

The referee further found that de la Pena conducted no other investigation himself regarding potential witnesses from the El Pilon area for alibi, age or mitigation purposes. Nor did he request anyone else to conduct additional investigation as to potential witnesses from the El Pilon area until after trial had begun in March 1984, when he sent investigator Mendoza to escort Dr. Godinez to the United States.

The referee refused to credit de la Pena's testimony regarding additional investigative efforts he claimed to have made. As to such testimony the referee found: "Based upon the entire record and the observation of the demeanor of all witnesses, the Referee does not credit the testimony of attorney [d]e [l]a Pena on matters where it is not independently corroborated by documents or other witnesses. The Referee makes this finding to indicate the basis on which the Referee made certain factual determinations in light of conflicting or disputed testimony in the record."

3. *Findings Relating to the Investigation and Presentation of Alibi Testimony*

(a) *Counsel's Investigation*

Most of the referee's findings on this matter are essentially a repetition of his general findings regarding de la Pena's investigation. There are, however, additional facts regarding de la Pena's efforts to bring in witnesses from Mexico to testify at trial: "During the trial, attorney [d]e [l]a Pena directed investigator Mendoza to try to bring the doctor and the parents . . . to the United States as witnesses. Mendoza informed Ana Maria Llamas, petitioner's sister who lived in Los Angeles, that he would be going to Mexico at a specific date to pick up the witnesses. . . . Mendoza relied entirely on Ana Maria to arrange for the witnesses in Mexico to come to the United States. When he did not hear from her, he went to Mexico with just one subpoena which would permit only Dr. Godinez to enter the United States to testify. . . . Attorney [d]e [l]a Pena made no efforts to bring any other persons from

Mexico as alibi witnesses. At trial, the prosecutor argued with great vehemence that the absence of a contemporaneous prescription or record was a major factor for the jury to consider as a basis for disbelieving Dr. Godinez as to the dates he treated Mr. Marquez."

(b) *Further Action Competent Counsel Would Have Undertaken*

The referee found: "Competent counsel would have taken further action by conducting interviews with members of petitioner's family who lived in El Pilon, such as Elena, Maria Elena, and Rigoberto Marquez . . . . Competent counsel would also have followed up additional investigation leads regarding potential witnesses outside the immediate family circle, such as Jesus Abarca, the keeper of the peace, and Jesus Serrano, petitioner's brother-in-law . . . , and other townpeople . . . . In sum, the townspeople of El Pilon, including family friends, and neighbors, were obvious potential witnesses in support of an alibi defense, and competent counsel would have interviewed a sufficient number of them to determine if their testimony was helpful and whether it significantly strengthened the defense as a whole." The referee rejected counsel's excuse that Ana Maria Llamas had not provided him with street addresses of potential witnesses in El Pilon, noting that while the streets of El Pilon had no names or numbers, everyone in the village knew everyone else.

The referee went on to find that competent counsel would have interviewed witnesses not only as to their general recollections, but whether they could relate their memories to specific datable events. In the present case, a church festival in February 1981 and the marriage of petitioner's brother Rigoberto in April 1981 bracket the date of the Hernandez murder (Mar. 15, 1981) and provide a basis for testimony concerning petitioner's presence in El Pilon.

(c) *Prejudicial Effect of Counsel's Inadequate Investigation*

We asked the referee for findings as to whether petitioner was denied effective assistance of counsel by reason of trial counsel's failure to undertake further action in obtaining and presenting alibi evidence. The referee interpreted this question "to call primarily for the referee's factual finding as to whether solid, credible and persuasive evidence would have been discovered by further action of competent counsel, and secondarily for the referee's opinion and recommendation on the ultimate legal question."

At the reference hearing, petitioner presented seven witnesses from El Pilon as a sample of the alibi evidence that would have been available and

presented declarations from ten others. The referee's report summarizes the testimony from the seven witnesses:

"*Mr. Jesus Abarca* testified that his daughter married petitioner's brother, Rigoberto, in 1981. Mr. Abarca saw petitioner and his girlfriend in El Pilon from a couple of months before the wedding until two or three months afterwards.

"*Mrs. Maria de la Luz Marquez,* petitioner's mother testified that petitioner arrived in the month of January before Rigoberto got married. Mrs. Marquez was able to date petitioner's arrival by an annual church festival which takes place in February. She and petitioner's girlfriend, Martina, had gone to Los Reyes to buy Martina a blue dress to wear to the festival. Petitioner and Martina were in El Pilon from the time of the festival until the time of Rigoberto's church wedding. Rigoberto celebrated his church wedding in April of 1981.[2]

"*Rigoberto Marquez,* petitioner's brother, testified that petitioner and his girlfriend came to El Pilon a few months before he got married. Rigoberto remembered going to meet them in another village with a mule and a horse, so that they would not have to walk to El Pilon. Rigoberto stated that petitioner and his girlfriend were in El Pilon for the church festival the same year he got married. At this festival, petitioner bought a calf that was going to be slaughtered, because he thought it was too young to be butchered and sold at the festival, and he felt sorry for it.

"*Elena Marquez,* petitioner's sister, testified that petitioner's girlfriend arrived at her house in Los Reyes after shopping with petitioner's mother for a dress to wear to the February festival at the church in El Pilon. A few months later, Rigoberto got married. Petitioner went to Los Reyes to help Elena and her three small children travel to El Pilon for the festivities.

"*Jesus Marquez,* petitioner's father, testified that petitioner arrived in El Pilon during the rice cutting season, which is December and January. His girlfriend arrived shortly afterward, and they both stayed through the rainy season, which is from June to October.

"*Maria Elena Marquez,* petitioner's sister, remembered petitioner and his girlfriend being present at the church festival in February of 1981, the year Rigoberto got married. Maria Elena was the maid of honor at Rigoberto's wedding. She remembered that petitioner was at the wedding celebration, and that he danced with her little girl.

---

[2]There was civil ceremony on March 25, 1981, and a church ceremony in April. This led to some confusion in the testimony.

"*Jesus Delgado Serrano*, husband of Maria Elena, and petitioner's brother-in-law, testified that he and his wife accompanied petitioner and his girlfriend to the church festival in February. He also remembered that petitioner was at Rigoberto's wedding celebration."

██ Petitioner also submitted declarations from 10 additional potential witnesses from El Pilon, who remembered that petitioner was present at the church festival and Rigoberto's wedding. Although hearsay, they were admitted without objection and therefore may be relied upon in support of the referee's findings. (See 3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, §§ 2033-2034, pp. 1994-1996.)

Petitioner presented the testimony of two expert attorney witnesses who had interviewed the witnesses. The referee noted their conclusion that the additional testimony of the witnesses discovered in the habeas corpus investigation would have greatly strengthened the alibi defense and would have created a reasonable doubt as to petitioner's guilt. The referee specifically found that "the potential alibi witnesses presented at the hearing were straightforward and credible witnesses, whose individual and combined testimony, including reference to and reliance upon extrinsically verifiable events would have added great strength to *any* alibi defense. . . . The evidence not presented would have been particularly valuable in this case because: 1) none of the witnesses who testified had any contemporaneously prepared documentation to anchor their recollections; 2) the alibi testimony of petitioner and his girlfriend was subject to skepticism for bias; and 3) as attorney Danilo Becerra . . . testified, the reliance on a Mexican doctor such as Dr. Godinez, testifying without corroborating documents, is very suspect . . . ."

The report concluded that "[b]ased on the foregoing findings of fact, the Referee recommends that petitioner Marquez be afforded a new trial on his guilt or innocence at which competent counsel can, after conducting a reasonably thorough investigation, present an alibi defense drawn from the full range of available evidence."

4. *Findings Relating to the Investigation and Presentation of Mitigating Evidence*

(a) *Counsel's Investigation*

The report reiterates the findings describing de la Pena's investigation, but finds that although he interviewed petitioner's parents and some of his sisters, he "did not interview them regarding matters relevant to mitigation

of penalty." The referee concluded that "[i]n sum, there was no penalty phase investigation conducted in this case with respect to petitioner's character, background, and conduct as a youth. The entire corpus of evidence presented as mitigation consisted of the brief references of the alibi witnesses and attorney [d]e [l]a Pena during *guilt* phase to the objective conditions of poverty existing in El Pilon."

### (b) *Further Action Which Competent Counsel Would Have Undertaken*

The referee found that competent counsel would have undertaken in-depth interviews with petitioner's family, friends, and neighbors in an effort to uncover mitigating evidence. He would not have relied on Ana Maria Llamas to make arrangements for the parents to come to California, but would have made arrangements for their attendance similar to those made for Dr. Godinez.

The referee noted that de la Pena had explained his failure to investigate as the result of his fear that an investigation might turn up aggravating evidence. According to de la Pena, an unnamed police officer in Buena Vista had referred to petitioner's reputation for violence and affinity for 9-milli-meter weapons. An uncle of petitioner's, whom de la Pena had encountered on the road to El Pilon, assertedly told him that petitioner had once shot someone in the leg.[3] De la Pena also observed that when petitioner was arrested in California, a large quantity of narcotics was discovered in the house.

The referee considered counsel's reliance upon the statement of the uncle and the police officer unfounded and found that "competent counsel would have conducted further investigation to determine the basis and reliability of these apparently adverse statements." He went on to conclude that "Attorney [d]e [l]a Pena's failure to conduct *any* penalty phase investigation about petitioner's individual characteristics cannot be viewed as an informed tactical decision because it is inherently unreasonable to forego *any* search for mitigation because of the fear of some inchoate adverse information. Unless a minimally adequate investigation is undertaken, it is impossible to make a tactical decision about whether to present or withhold mitigating evidence at the penalty phase."

### (c) *Prejudice*

The referee's report states: "As a sample of the evidence in mitigation that would have been available had attorney [d]e [l]a Pena conducted an

---

[3]Petitioner suggests that de la Pena misunderstood what the uncle was saying, and that he was in fact referring to an incident in which petitioner had been shot in the leg when he was a child.

adequate penalty phase investigation, petitioner presented the following testimony:

"(i) Petitioner's mother testified that as a young child petitioner would help her, even with jobs considered 'women's work.' When her own father died, petitioner consoled her. When his brother and sisters would argue, petitioner would ask them to calm down and tell them not to fight. He was a good son to her.

"(ii) Ana Maria, petitioner's sister, testified that petitioner was a generous little boy, always sharing fruit with his mother. He would always ask his mother to feed people who begged for food. Petitioner was sensitive to others' feelings, and often comforted his mother. He would ask his father to buy shoes for the girls first, and to let him be the last. Petitioner was a hard worker. On days that he did not work in the fields with his father, he would go to the forest to cut wood. Petitioner was also the family peacemaker. When the children were fighting or arguing, he would try to calm them down.

"(iii) Rigoberto, petitioner's brother, testified that at the February church festival in 1981, petitioner bought a young calf to save it from slaughter. Rigoberto and petitioner worked in the fields together when they were young.

"(iv) Elena, petitioner's sister, testified that petitioner was a generous little boy. She remembered that one Easter time, her father mentioned that he would like to have a local specialty dish of nopales (boiled cactus leaves), but no one wanted to go cut them down, because of the thorns. Petitioner volunteered for the job and cut them and brought them to her father. When Elena stayed with her grandmother, she would cry because she missed her home. Petitioner would console her. He was a good brother to her.

"(v) Petitioner's father testified that petitioner worked hard in the fields from the time he was very young. One year when petitioner was about eight years old, they planted in the field called El Nopal, but the crop failed for lack of rain. Petitioner volunteered to go to work in a nearby grain mill and earned money to help his father buy corn for the family to eat. He was a very good son.

"(vi) Maria Elena, petitioner's sister, testified that petitioner not only worked in the fields as a young boy, but also volunteered for chores in the home. This was unusual, because such chores were considered 'women's work,' which was a source of amusement in the family. When Maria's young son became sick, petitioner travelled to Apatzingan to be with him."

The referee found that these witnesses "gave credible and compelling testimony about good qualities of petitioner which could have provided the nucleus of a very strong case in mitigation of penalty." He noted that defense counsel could have used such testimony to focus on petitioner's generosity, his consideration of others, and his capacity for hard work. The referee concluded that petitioner should receive a new penalty trial.

### 5. Findings Relating to the Investigation and Presentation of Evidence Relating to Petitioner's Age

While petitioner's habeas corpus counsel attempted to show that trial counsel did not adequately investigate the question of petitioner's age at the time of the 1979 murder, they offered no showing that a more thorough investigation would have uncovered favorable evidence. When there has been no showing of prejudice, we need not determine whether trial counsel's performance was deficient. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 697 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *In re Fields* (1990) 51 Cal.3d 1063, 1079 [275 Cal.Rptr. 384, 800 P.2d 862].)

### ANALYSIS OF REFEREE'S FINDINGS

### 1. Principles Governing Ineffectiveness of Counsel Claims

Under both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution, a criminal defendant has the right to the effective assistance of counsel. (*In re Fields, supra,* 51 Cal.3d at p. 1069; *In re Cordero* (1988) 46 Cal.3d 161, 180 [249 Cal.Rptr. 342, 756 P.2d 1370].) Specifically, he is entitled to the reasonably competent assistance of an attorney acting as his diligent and conscientious advocate. (*In re Cordero, supra,* 46 Cal.3d at p. 180.) This means that before counsel undertakes to act, or not to act, counsel must make a rational and informed decision on strategy and tactics founded upon adequate investigation and preparation. (*In re Fields, supra,* 51 Cal.3d at p. 1069; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].)

There are two components to a claim by a defendant that his counsel's assistance was so defective as to require reversal of a conviction or death sentence. (*In re Fields, supra,* 51 Cal.3d at p. 1069; *People* v. *Ledesma, supra,* 43 Cal.3d at p. 216; *Strickland* v. *Washington, supra,* 466 U.S. at p. 687 [80 L.Ed.2d at p. 693].) "First, the defendant must show that counsel's performance was deficient." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 687 [80 L.Ed.2d at p. 693]; accord *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) This requires a

showing that "counsel's representation fell below an objective standard of reasonableness." (*Strickland, supra,* at p. 688 [80 L.Ed.2d at p. 693]; accord *Pope, supra,* at pp. 423-425.) In evaluating a defendant's showing of incompetence, we accord great deference to the tactical decisions of trial counsel. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 689 [80 L.Ed.2d at p. 694].)

The second component requires that the defendant show prejudice resulting from counsel's alleged deficiencies. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . . [¶] The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland* v. *Washington, supra,* 466 U.S. at pp. 693-694 [80 L.Ed.2d at pp. 697-698]; *In re Fields, supra,* 51 Cal.3d at p. 1070.)

■ Our standard of review of the referee's report is settled. The referee's conclusions of law are subject to independent review, as is his resolution of mixed questions of law and fact. (*In re Cordero, supra,* 46 Cal.3d at pp. 180-181; *People* v. *Ledesma, supra,* 43 Cal.3d at p. 219.) "Mixed questions 'include the ultimate issue, whether assistance was ineffective, and its components, whether counsel's performance was inadequate and whether such inadequacy prejudiced the defense.' " (*In re Cordero, supra,* 46 Cal.3d at p. 181.) The referee's findings of fact, though not binding on the court, are given great weight when supported by substantial evidence. The deference accorded factual findings derives from the fact that the referee had the opportunity to observe the demeanor of witnesses and their manner of testifying. (*Ibid.*)

### 2. *Investigation and Presentation of Alibi Evidence*

■ As noted, the referee found counsel's investigative efforts inadequate. He found that counsel spent less than one-half hour in El Pilon and went nowhere in El Pilon other than the Marquez house. Counsel interviewed three potential witnesses in Mexico and eventually called only one, Dr. Godinez. The referee found that competent counsel would have interviewed petitioner's brothers, sisters, and neighbors in El Pilon, and the sister in nearby Los Reyes. Competent counsel would have interviewed potential alibi witnesses not only as to their general recollection of petitioner's

presence in El Pilon but would have made specific inquiries as to whether their recollections could be tied to extrinsically verifiable events such as local festivals. Competent counsel would also have made arrangements for such witnesses to testify. The referee further found that there were potential alibi witnesses whose testimony at the hearing was straightforward and credible and that their testimony would have added great strength to petitioner's alibi defense.

We agree that the record supports the referee's assessment of trial counsel's performance as being inadequate. We do not agree, however, with the referee's assessment of prejudice. To prove prejudice petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at pp. 697-698]. To determine whether prejudice has been established, we compare the actual trial with the hypothetical trial that would have taken place had counsel competently investigated and presented the alibi defense. (*In re Fields, supra,* 51 Cal.3d at p. 1071.) This requires knowledge of all of the evidence that was presented at trial, not just the evidence that was presented at the habeas corpus hearing. Since the referee had not made a full review of the evidence that was presented at trial, we do not find his recommendation persuasive.

After reviewing the evidence presented at trial, we are convinced that there is no reasonable probability that the jury would have reached a different result had it heard the testimony of all 17 alibi witnesses mentioned in the referee's report. Granted that the referee found their testimony solid and credible, but it was also vague as to specific times. These witnesses tied petitioner's presence to certain events, but their recollection of these events was also somewhat vague. For example, the father of the bride could not remember when the wedding was. Petitioner's mother said he came in January and that he got sick about the time of Rigoberto's wedding. Petitioner's father said he was cutting rice when petitioner and Martina arrived. Moreover, the referee's finding of credibility was made in a vacuum without knowledge of the contradictions presented by trial testimony. Furthermore, the alibi evidence presented at the habeas corpus proceeding was cumulative to that presented at trial.

Petitioner's attempt to explain away his confession is unconvincing. Petitioner's knowledge of the details of the two crimes is too extensive and specific to have been learned from others. It strains credulity to assert that petitioner learned the extensive details of both crimes from conversations

with other people. As to the 1979 murder, petitioner knew where it occurred, the type of weapon used, and the location of the wound. As to the 1981 murder, petitioner knew the victim was watching television, knew the approximate time of the incident, knew that there was a woman, as well as a little girl, speaking English in the house, knew how people were dressed, and described the vehicle used in the crime. To accept petitioner's explanation that the officers fed him the information would require us to conclude that Detective Johnston, Detective Parrott, and Detective West each lied in his or her testimony. The officers' version is far more believable than petitioner's.

Moreover, petitioner's testimony was fraught with inconsistencies and alleged lapses of memory. Petitioner could not even remember whether he returned from Mexico with Martina or alone. Petitioner denied having a relative named Mario, but his sister Ana Maria knew of such a relative. In short, the nature of petitioner's trial testimony was not such as to engender confidence in his credibility. If the jury determined he was not credible, it is hard to believe they would have accepted his trial recantation of the statements made to the investigating officers. In such a case, the number of alibi witnesses presented or not presented becomes irrelevant.

The referee was also unaware of the strong identification testimony presented by three eyewitnesses: the victim's wife, Connie Hernandez, and the victim's stepdaughters, Sandra and Tina de la Fuente. Each separately identified petitioner from a live lineup and at trial. Each had sufficient opportunity to observe petitioner and had a strong recollection of his appearance. Finally, each testified that she recognized petitioner as soon as he entered the lineup area.

We must contrast the vague recollections of the new alibi witnesses, on the one hand, with the strong and detailed identification testimony and comprehensive confession given by petitioner. After comparing the two, we conclude that the new alibi testimony would have made no difference at trial and would not undermine confidence in the result of the guilt phase of the trial.

### 3. *Investigation and Presentation of Mitigating Evidence*

As previously mentioned, the referee found that counsel had undertaken no investigation of mitigating evidence and presented none at trial. The referee also found counsel's purported justification insufficient, observing that reasonably competent counsel would not have stopped at the first sign that an investigation might produce harmful evidence. Counsel would continue until counsel learned the nature and strength of that evidence and

could weigh it against the mitigating evidence counsel had discovered. "Unless a minimally adequate investigation is undertaken, it is impossible to make a tactical decision about whether to present or withhold mitigating evidence at the penalty phase."

We agree with the referee's analysis. In some cases, counsel may reasonably decide not to put on mitigating evidence, but to make that decision counsel must understand what mitigating evidence is available and what aggravating evidence, if any, might be admissible in rebuttal. Counsel here had no knowledge of the available mitigating evidence, and while he had encountered ominous signs, he was in no position to assess the admissibility or strength of any aggravating evidence. His decision not to find out, and to offer nothing in mitigation, cannot be supported as a tactical choice.

■ The test for prejudice arising from incompetence of counsel at a penalty trial resembles that for incompetency of counsel at the guilt trial. "[T]he question is whether there is a reasonable probability that, absent the errors [of counsel], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 695 [80 L.Ed.2d at p. 698]; *In re Fields, supra,* 51 Cal.3d at p. 1078.) As in the guilt phase, reasonable probability is defined as one that undermines confidence in the verdict. (*Fields, supra,* at pp. 1078-1079.)

We considered a similar question in *People* v. *Durham* (1969) 70 Cal.2d 171, 191-192 [74 Cal.Rptr. 262, 449 P.2d 198], where we rejected a claim that the failure to present mitigating evidence conclusively proved inadequate representation. We noted that the defendant failed to point to any specific mitigating evidence that counsel could have presented, and that counsel cross-examined the People's penalty phase witnesses and presented a well-reasoned argument to the jury based upon the evidence presented at the guilt phase.

Subsequently, in *People* v. *Frierson* (1979) 25 Cal.3d 142, 166 [158 Cal.Rptr. 281, 599 P.2d 587], we found counsel's failure to present mitigating evidence incompetent, noting that the defendant had shown mitigating evidence that could have been presented and that counsel was not able to base a penalty defense on evidence presented at the guilt phase.

In our most recent decision on the subject, *In re Fields, supra,* 51 Cal.3d at pages 1079-1081, we found no prejudice despite the fact that counsel offered no evidence at the penalty trial and made no investigation to discover such evidence. The defendant, however, had pled not guilty by reason of insanity,

and considerable evidence relating to his background, character, and mental condition was introduced through expert testimony at the sanity phase. Defense counsel cited this evidence when he argued for mitigation at the penalty trial. We concluded that the failure to investigate or present evidence was not prejudicial, since the jury already had a fairly accurate picture of the case in mitigation and the additional evidence that a further investigation might have uncovered would not significantly have altered this picture.

The reasoning of *Durham* (*supra*, 70 Cal.2d 171) and *Fields* (*supra*, 51 Cal.3d 1063) cannot be applied in this case. Unlike *Fields*, there was no sanity phase, and unlike *Durham*, counsel did not present an argument for mitigation based on guilt phase evidence because no such evidence was presented. The only evidence offered at the guilt phase that might be considered mitigation was a description of the village of El Pilon, and counsel did not argue that evidence at the penalty trial. There was no evidence of petitioner's background or character. When the time came for defense counsel to argue mitigation, counsel merely said he had "nothing more" to add.

We have also reviewed decisions of the federal courts relating to alleged inadequacy of counsel at a penalty trial. After excluding those cases in which counsel's action was the result of a reasonable tactical decision, we have discovered several that consider situations similar to the present case.

In *Armstrong* v. *Dugger* (11th Cir. 1987) 833 F.2d 1430, the court rejected the argument that Armstrong had failed to prove prejudice resulting from his counsel's failure to investigate mitigating evidence. The opinion summarized the evidence presented at the habeas corpus evidentiary hearing: "Armstrong and various family members testified about his poverty and the poor living conditions of his childhood. Armstrong's grandmother testified that Armstrong did not have adequate adult supervision as a child. She further testified that his work as a fruit picker during his early years supplemented his grandmother's income, but resulted in irregular school attendance. Armstrong's mother testified about his reputation as a hardworking child. Several witnesses testified about Armstrong's history of nonviolence and his religious activities. Both Armstrong and his mother testified about his epileptic seizures, and an expert . . . testified that petitioner was mentally retarded and had organic brain damage." (*Id.* at pp. 1433-1434.)

The court concluded that "[t]he major requirement of the penalty phase of a trial is that the sentence be individualized by focusing on the particularized characteristics of the individual. [Citations.] The evidence before the district court plainly established that Armstrong's trial counsel failed to provide the

jury with the information needed to properly focus on the particularized characteristics of this petitioner." (*Armstrong* v. *Dugger, supra*, 833 F.2d at p. 1433.)

In *Thomas* v. *Kemp* (11th Cir. 1986) 796 F.2d 1322, the evidentiary record showed that "[t]wo faculty members of the Roosevelt High School, which Thomas attended, testified that had they been called to the sentencing hearing, they would have told the jury about Thomas' difficult home environment, about the mental and physical abuse which he encountered there, about his mother's drinking problem, and that Thomas, despite being a slow learner, had worked hard to improve his grades. Two former employers would have testified that Thomas was an excellent worker when given simple work assignments, was always punctual, and had suffered adverse consequences from his mother's drinking problem. Various family members would have testified that Thomas was a loving son who cared deeply for his mother. A psychiatrist could have presented testimony showing Thomas as a pathetically sick youngster who had struggled to succeed in life, both in school and on the job, despite a chaotic home environment and a major mental illness." (*Id.* at p. 1325.)

The court concluded: "It cannot be said that there is no reasonable probability that the results of the sentencing phase of the trial would have been different if mitigating evidence had been presented to the jury. [Citation.] The key aspect of the penalty trial is that the sentence be individualized, focusing on the particularized characteristics of the individual. [Citation.] Here the jurors were given no information to aid them in making such an individualized determination." (*Thomas* v. *Kemp, supra*, 796 F.2d at p. 1325.)

In *Pickens* v. *Lockhart* (8th Cir. 1983) 714 F.2d 1455, the court referred to evidence "of a turbulent family background, beatings by a harsh father, and emotional instability." (*Id.* at p. 1466.) It concluded that "[i]t is sheer speculation that character witnesses in mitigation would do more harm than good . . . and that Pickens was not prejudiced by the omission. Here, counsel's default deprived Pickens of the possibility of bringing out even a single mitigating factor. . . . We find that Pickens was actually and substantially prejudiced in the penalty phase of the case." (*Id.* at pp. 1467-1468.)

Finally, in *Blake* v. *Kemp* (11th Cir. 1985) 758 F.2d 523, the petitioner "proffered four persons, in addition to his mother, who could and would have testified . . . to the effect that Blake was a man who was respectful

toward others, who generally got along well with people and who gladly offered to help whenever anyone needed something. His mother also named four other persons who would have testified on Blake's behalf but who had since died." (*Id.* at p. 534.) The circuit court concluded that "[t]he district court was correct when it noted that the available mitigating evidence 'might have demonstrated to the jury that the petitioner was not the totally reprehensible person they apparently determined him to be.' . . . [¶] We thus believe that the probability that Blake would have received a lesser sentence but for his counsel's error is sufficient to undermine our confidence in the outcome." (*Id.* at p. 535.)

As in the cited federal cases, the mitigating evidence uncovered in the habeas corpus investigation in the present case was substantial, and not cumulative to any evidence offered at trial. It would give the jury, for the first time, a description of petitioner's childhood and adolescence growing up in the village of El Pilon, and put before the jury the positive aspects of his character. It would show, also, that his family, relatives, and neighbors believe in him and are willing to travel from Mexico to testify on his behalf. It would, in short, permit the jury to make an "individualized" decision, one based not only on the facts of the crime, but on the whole life of the defendant.

If this evidence were weighed against the relatively spare aggravating evidence—there was no proof of prior convictions or of uncharged acts of criminal violence—we think it is reasonably probable that a jury would conclude that life imprisonment without possibility of parole was a sufficient punishment. We cannot put confidence in the verdict of a jury that decided the case without hearing the substantial mitigating evidence that competent counsel could and should have presented.

## DISPOSITION

The judgment of the Los Angeles County Superior Court in People v. Gonzalo Marquez Marquez, No. A-528001, is vacated insofar as it imposes a sentence of death. Because the judgment sentencing petitioner to prison is valid in all other respects, he is not presently entitled to release. The order to show cause is therefore discharged and the petition for writ of habeas corpus is denied. Upon finality of this opinion, the Clerk of the Supreme Court shall remit a certified copy of this opinion and order to the superior court for filing, and respondent Attorney General shall serve another copy thereof on the prosecuting attorney in conformity with Penal Code section 1382,

subdivision (b). (See *In re Hall* (1981) 30 Cal.3d 408, 435, fn. 9 [179 Cal.Rptr. 223, 637 P.2d 690].)

Lucas, C. J., Arabian, J., and Baxter, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—Although I agree with the majority that petitioner's death sentence must be vacated because of trial counsel's inadequate preparation and presentation of the penalty phase, I find counsel's performance at the guilt phase to be equally inadequate. I therefore dissent from the majority's decision to uphold petitioner's conviction for murdering Ascencion Hernandez.

The hearing before this court's habeas corpus referee established beyond question that defense counsel's investigative efforts to prepare for the guilt phase of this case were shockingly inadequate, and indeed were a misuse of the funds allocated to him for that purpose. Counsel failed to properly pursue an investigation that would have led him to *17* alibi witnesses, who were prepared to testify that at the time of the murder petitioner was in a small village in Mexico, located more than 1,500 miles from the scene of the crime. At the reference hearing, a representative sample of the 17 witnesses testified; the referee, a retired superior court judge with many years of experience, found the testimony to be straightforward and credible.

The majority does not dispute defense counsel's incompetence at trial; it finds his inadequacy harmless because of the strong evidence of guilt. But the doctrine of harmless error can only be taken so far. By holding that 17 alibi witnesses are insufficient to cast doubt on the legitimacy of the verdict, the majority stretches it past the breaking point.

### I.

On March 15, 1981, three men invaded the home of Ascencion Hernandez and murdered him. Nine months later, police arrested petitioner and charged him with killing Hernandez. At trial, the prosecution relied chiefly on evidence that defendant was identified as one of the killers by the victim's wife and two children, and that petitioner admitted participation in the offense to Detective Linda Parrott of the El Monte Police Department.

Petitioner presented an alibi defense at trial. He testified that he had been staying in the remote Mexican village of El Pilon in the months before and

after the murder, and was in an infirmary in a nearby town on the day of the murder.[1] He said that when Detective Parrott questioned him, his girlfriend (whom petitioner referred to as his wife) was pregnant and in custody, and Detective Parrott promised him his girlfriend would be released if he told Parrott what she wanted to hear. He said he answered "yes" to whatever Parrott said in the hope that it would lead to his girlfriend's release. He also claimed he did not understand everything Parrott said because he did not understand her Spanish.[2] Parrott's interview with defendant was not tape-recorded, nor was any other means used to preserve a verbatim record of defendant's statement.

Three other witnesses testified at trial in support of petitioner's alibi defense: his girlfriend, who said she was with petitioner in Mexico at the time of the murder; petitioner's sister, Ana Maria Llamas, who was living in the United States and testified that petitioner had left this country but that she did not actually observe him in Mexico; and Dr. J. Jesus Godinez Gonzales (Dr. Godinez), a physician from a town near El Pilon, who said petitioner was an inpatient at his clinic on the day of the murder. The testimony of these witnesses was open to question, for various reasons: the girlfriend had an obvious bias, the sister had no personal knowledge that petitioner was in Mexico, and Dr. Godinez had no records corroborating his testimony and had told an investigator for the prosecution that he did not know the exact dates on which he treated petitioner.

At the habeas corpus reference hearing, overwhelming evidence was presented that defense counsel's trial preparation for the guilt phase was grossly inadequate. Because petitioner said he was in El Pilon at the time of the murder, a thorough effort to locate alibi witnesses in El Pilon was essential to prepare for trial. Defense counsel and his investigator took a week-long investigative trip to Mexico, during which they spent five nights in a luxury hotel in Mexico City and one night in the resort town of Patzcuaro. They spent only one day in El Pilon; the only witnesses they interviewed there were petitioner's parents and Dr. Godinez (who lived in a nearby town).

Petitioner's parents and Dr. Godinez corroborated petitioner's alibi defense. Although defense counsel subpoenaed Dr. Godinez to testify at trial,

---

[1] El Pilon is in the Province of Michoacan, which is in central Mexico. It is more than 1,500 miles from Los Angeles County, where Hernandez was murdered.

[2] Defendant's claim that he did not understand Parrott is supported by his actions at the lineup at which the victim's wife and children identified him. Although the police officer in charge gave directions in Spanish as well as English, defendant exhibited substantial confusion and, unlike the other participants in the lineup, had difficulty in following the officer's directions.

he made wholly inadequate efforts to secure the attendance of petitioner's parents, as a result of which they were not available to testify at trial. In attempting to justify his actions at trial, counsel gave demonstrably false testimony at the reference hearing. As a result, the referee made an express finding that he did "not credit the testimony of attorney [d]e [l]a Pena where it is not independently corroborated by documents or other witnesses."[3]

At the habeas corpus reference hearing, seven residents of El Pilon testified as a "sample" of the alibi evidence that could have been offered had counsel undertaken an adequate investigation. The referee also admitted, without objection from the prosecution, declarations from an additional 10 villagers. The testimony and declarations stated that petitioner was in El Pilon from the time of the village's annual festival celebrating the consecration of its church one month before the murder of Hernandez until the

---

[3]The following examples illustrate defense counsel's apparent falsehoods in his attempts to justify his actions:

1. In explaining at the reference hearing his ability to deal with possible language difficulties, defense counsel testified that he had a master's degree in Spanish from the University of California at Los Angeles (UCLA), a claim he had also made at trial. When petitioner presented documentary evidence that UCLA had no record of giving counsel a master's degree, counsel then claimed that he had been involved in an undercover investigation for the United States Navy and attended UCLA under an assumed name. Petitioner responded with a declaration from a naval officer, who said that he had searched counsel's military records and that during the time period in question counsel did not have an undercover assignment: he was a naval recruitment officer and was attending law school at Southwestern University in Los Angeles.

2. In a sworn declaration in which he attempted to account for the deficiencies in his investigation, defense counsel said that Ana Maria Llamas, petitioner's sister who had testified at trial, told him that petitioner had no other siblings in the United States. When, at the reference hearing, petitioner pointed out that at trial defense counsel had elicited testimony from Llamas that petitioner had a brother in the United States, counsel claimed that Llamas had told him that she did not know how to locate her brother. Thereafter Llamas denied telling counsel any such thing; three witnesses testified that petitioner's brother was living with Llamas and her husband at the time of petitioner's trial, and the parties stipulated that the supervisor at Los Angeles Die and Mold Company would testify that petitioner's brother and Llamas's husband were both working for the company at the time of trial.

3. Defense counsel wrote to petitioner's appellate counsel claiming that while in Mexico he had interviewed five of petitioner's sisters and three of his brothers. He added, "[T]he five sisters were extremely impressive in terms of appearance. The brothers left a lot to be desired." But in his initial testimony before the habeas corpus referee, counsel said he had been unable to interview the brothers and sisters. And in a declaration filed by the Attorney General in opposition to the petition for writ of habeas corpus, counsel asserted that he had asked petitioner's parents to bring the brothers and sisters to meet with him, but that they had not done so. When faced at the reference hearing with these inconsistent statements, counsel professed a lack of memory, and suggested that he "may have interviewed them by telephone." It is difficult to reconcile an interview by telephone with counsel's comments (in his letter to appellate counsel) about the appearance of the interviewees. Also, some of petitioner's siblings lived in El Pilon, where there are no telephones. Moreover, the written report prepared by counsel's investigator at the time of the trip failed to show that any interviews had been conducted.

wedding of petitioner's brother one month after the murder. As noted earlier, the referee found that the seven witnesses who testified were "straightforward and credible."

## II.

The majority does not dispute the hearing referee's conclusion that defense counsel's investigation of the alibi defense was inadequate. Nor does the majority disagree with the referee's finding that the testimony of the alibi witnesses at the reference hearing was credible. Instead, the majority concludes that counsel's inadequacy was harmless. It cites several grounds for this holding, none of which is persuasive.

First, the majority attempts to impugn the accuracy of the recollections of the alibi witnesses who testified at the reference hearing, saying that their testimony was "vague as to specific times." (Maj. opn., *ante*, p. 604.) Not so. The residents of El Pilon explicitly recalled that petitioner was present at particular events that were important in their lives: a wedding and a religious festival. Although some of them were not able to recall the exact dates on which those events took place (this is hardly surprising, as the reference hearing took place several years after the events in question), those dates are independently verifiable and not in dispute.

Next, the majority asserts that the alibi testimony of the residents of El Pilon was "cumulative" to the alibi defense that had been presented at trial. This assertion, however, is directly contrary to the findings of the habeas corpus referee, who concluded: "The evidence not presented [at trial] would have been particularly valuable in this case. . . ." The referee gave three reasons for this finding: 1) the witnesses who testified at trial had no "contemporaneously prepared documentation to anchor their recollections"; 2) petitioner's own alibi testimony and that of his girlfriend were open to question because of their obvious bias; and 3) Dr. Godinez's testimony was also suspect because he could produce no corroborating documents.

The majority's claim that the alibi testimony by the residents of El Pilon would have been "cumulative" to the alibi testimony presented at trial ignores the just-discussed findings by the referee. The alibi evidence that could have been provided by the residents of El Pilon was not cumulative to the alibi testimony presented at trial because, unlike the testimony at trial, the residents of El Pilon could have given testimony that was anchored to specific, independently verifiable occurrences. Furthermore, if the defense had been able to offer the testimony of 20 alibi witnesses (the 3 who actually testified at trial plus the 17 residents of El Pilon who could have testified),

the very fact that 20 persons were willing to offer alibi testimony on petitioner's behalf would have weighed powerfully in his favor.

Third, the majority concludes that the prosecution's strong evidence of guilt rendered defense counsel's inadequacy at trial harmless. But the fact that the prosecution had a strong case does not permit us to uphold the conviction when defense counsel inadequately failed to present a persuasive alibi defense; such a defense may raise a reasonable doubt in the jury's mind even when evidence of guilt is strong. The majority cites no published decision that has treated as harmless the unjustified failure by defense counsel to have a credible alibi witness testify. When incompetence of this nature has occurred, California and federal courts have uniformly found that counsel's inadequacy requires reversal of the judgment. (*People* v. *Shaw* (1984) 35 Cal.3d 535 [198 Cal.Rptr. 788, 674 P.2d 759]; *In re Hall* (1981) 30 Cal.3d 408 [179 Cal Rptr. 223, 637 P.2d 690]; *Montgomery* v. *Peterson* (7th Cir. 1988) 846 F.2d 407; *Code* v. *Montgomery* (11th Cir. 1986) 799 F.2d 1481; *Nealy* v. *Cabana* (5th Cir. 1985) 764 F.2d 1173; *Eldridge* v. *Atkins* (8th Cir. 1981) 665 F.2d 228; *Wilson* v. *Cowan* (6th Cir. 1978) 578 F.2d 166; *Bell* v. *Georgia* (5th Cir. 1977) 554 F.2d 1360.)[4]

Moreover, although the evidence of guilt was strong, it was not conclusive. No physical evidence linked defendant to the murder; the prosecution's case was based on identifications by three eyewitnesses and on petitioner's alleged confession. This testimony, although persuasive, was not immune to challenge.

The victim's wife and two children each positively identified petitioner at a lineup and at trial. But cases of mistaken eyewitness identification are not uncommon. As one court has observed: "However convinced, and convincing, [the eyewitnesses] were in their identification at trial, we cannot ignore the fact that the identification of strangers in violent crime situations is fraught with the hazard of mistake." (*Wilson* v. *Cowan, supra,* 578 F.2d at p. 168 [new trial ordered for counsel's inadequate failure to call alibi witness, despite the fact that the two victims had identified the defendant at a

---

[4]In several of the cases cited, defense counsel was found to be inadequate not only for failure to investigate and present alibi witnesses, but in other respects as well. Here, too, the defense attorney's inadequacies were not confined to investigation and presentation of petitioner's alibi defense. Counsel's investigation and presentation of the penalty phase were manifestly deficient; the majority agrees that as a result petitioner is entitled to a new trial on the issue of penalty. In addition, as explained in this court's opinion addressing petitioner's appeal, defense counsel took the bizarre step of calling himself as a witness to rebut a minor point made by the prosecution. The prosecution then asked him questions that went far beyond the scope of his testimony on direct examination; instead of objecting, counsel answered the questions, giving testimony that damaged his client's case. (*People* v. *Marquez, ante,* 553, at pp. 573-574 [3 Cal.Rptr.2d 710, 822 P.2d 418].)

lineup and at trial].) This court, too, has recognized the fallibility of eyewitness identification in such circumstances. (*People* v. *McDonald* (1984) 37 Cal.3d 351, 363-364 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].) In this case, there are additional reasons to question the identifications by the witnesses: they were not made until six months after the murder; the victim's wife was unable to select petitioner's picture out of a photographic lineup; and the identifications by the victim's two daughters may have been influenced by their mother's actions at the lineup at which they identified petitioner (the mother got up from her seat, stood in front of petitioner, and glared at him, thus suggesting to her daughters her belief that he was the murderer).

Detective Parrott testified that defendant confessed his involvement in the murder to her. Petitioner, however, repudiated his confession at trial, claiming that he had difficulty understanding Parrott and that he answered "yes" to whatever she said in the hope of securing the release of his pregnant girlfriend, who was in custody. The majority finds Detective Parrott's description of petitioner's confession more convincing than that of petitioner. But because the police did not record the confession, it is difficult to evaluate whether Parrott's account or petitioner's is the more accurate. If the defense had called the 17 alibi witnesses from El Pilon to substantiate petitioner's claim that he was out of the country at the time of the murder, the jury might well have believed petitioner's explanation for his confession.

But for defense counsel's inadequate performance, petitioner would have been able to counter the prosecution's strong evidence of guilt with strong evidence of innocence. We do not know how a jury would have resolved an evidentiary dispute of this nature.

The United States Supreme Court has held that to obtain relief on the basis of ineffective assistance of counsel, a defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." (*Strickland* v. *Washington* (1980) 466 U.S. 668, 693 [80 L.Ed.2d 674, 697, 699-700, 104 S.Ct. 2052].) Rather, reversal of the conviction is required when there is a probability "sufficient to undermine confidence in the outcome" that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694 [80 L.Ed.2d at p. 698].) Had counsel adequately presented petitioner's strong alibi defense, it cannot be concluded with confidence that the result—conviction of murder—would have been the same. In such circumstances, we must put aside our personal beliefs as to petitioner's guilt or innocence: a jury must listen to all of the evidence, presented by competent attorneys, and make its own determination as to the truth of the charge.

I would reverse petitioner's conviction for murdering Ascencion Hernandez.[5]

Mosk, J., concurred.

Appellant's petition for a rehearing was denied March 18, 1992. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

.

---

[5]With regard to petitioner's conviction for the murder of Angel Rodriguez, although the issue is closer, I am of the view that defense counsel's inadequate representation of petitioner on the charge of murdering Ascencion Hernandez prejudicially affected petitioner's conviction of murdering Rodriguez. The only evidence linking petitioner to the murder of Rodriguez was his admission to Detective Parrott that he was the killer. That admission, however, occurred at the same time that petitioner confessed his involvement in killing Hernandez. At trial, petitioner repudiated both confessions, for the reasons previously explained. If defense counsel had presented alibi testimony from the residents of El Pilon to refute the charge of murdering Hernandez, it would have supported petitioner's claim that one portion of his statement to Detective Parrott was incorrect, thereby undermining confidence in the remaining portion as well.