Filed 3/5/14  P. v. Gorman CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES ANDRE GORMAN,<br><br>    Defendant and Appellant. | C068721<br><br>(Super. Ct. No. SF101703A) |
| In re JAMES ANDRE GORMAN on Habeas Corpus. | C073222<br><br>(Super. Ct. No. SF101703A) |

In his appeal and petition for writ of habeas corpus, James Andre Gorman challenges his murder conviction based on a claim of ineffective assistance of his retained trial counsel.  Gorman has demonstrated counsel failed to produce three available witnesses, two of whom could have bolstered Gorman's alibi, and one who

1

could have identified another plausible killer, the victim's daughter, who was with the victim near the time of the killing and who made inculpatory admissions. Counsel's other alleged failings are unnecessary to address, as his ineffectiveness regarding these three witnesses is "sufficient to undermine [our] confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 698] (*Strickland*).)

Accordingly, we shall grant Gorman's habeas corpus petition and vacate his conviction because his trial counsel provided him with ineffective assistance. Because all of the issues raised in the appeal can be addressed on retrial, if any, we shall dismiss the appeal as moot.

## FACTUAL AND PROCEDURAL BACKGROUND

The killing occurred in March 2005. Gorman was charged with murder in September 2006. On September 28, 2006, attorney Ralph Cingcon first appeared as his retained criminal defense attorney. Cingcon represented Gorman at his March 2007 preliminary hearing and through his trial. Gorman's trial commenced in May 2011-- nearly five years after hiring Cingcon. During that time, Cingcon actively sought or acquiesced in numerous continuances.

A. *Facts at Trial*

Frankie Lee Todd was bludgeoned to death in the early morning of March 25, 2005. An earring was found under her body, and a fireplace poker was found nearby. A drug pipe was found in her front pocket. No fingerprints linked to Gorman were found.

Officers began arriving before 7:00 a.m., after a neighbor called 911. The house was in disarray, the front room (containing the body) was messy, and a table was upset. In Todd's daughter, Dorshea Cleveland's, bedroom, candles burned and a radio played, and Cleveland's purse containing credit and identification cards belonging to other people, was there.

2

Todd's house had drug "traffic" in the late night and early morning hours, and had been the subject of a number of police service calls, including for a fatal overdose in January 2004, and drugs and firearms were seized at the house in February 2004.

At the autopsy, conducted on March 27, 2005, a photographer documented marks on Todd's buttocks. In addition to the photographer, the pathologist, his assistant, and Detective Robert Molthen attended the autopsy. The pathologist pointed out possible bite marks on the buttocks and stomach, and a few days later, a father-son forensic dental team examined the body, looked at the autopsy photographs, and agreed the marks *appeared* to be bite marks, but they would not "commit to 100 percent[.]"

Forensic dentist Steven Sanford testified he had been in practice with his father-- also a forensic dentist but deceased before the trial--and they both had examined the body at Molthen's request.[1] Todd's jeans were on. There appeared to be a bite mark in her armpit area. The marks on her abdomen and buttocks were consistent with bite marks. Doctors Sanford and son took no notes and prepared no reports. Steven Sanford could not tell how long relative to Todd's death the event causing the marks had occurred, nor could he say with certainty that they were bite marks. However, he opined that they were less than three weeks old.

Gorman's DNA was found on Todd's jeans, near the apparent bite mark on her buttock. There is no way to tell how long that DNA had been present on the jeans. There was no DNA testing of a baseball bat found in a car trunk, because there was no blood on it, nor was any DNA found on the earring found under the body. The bat and jeans could have been cleaned to remove DNA, but washing clothing may leave detectable DNA. DNA can be transferred onto clothing when two people touch.

_____

[1] Contrary to all other witnesses, and even the People's stated view in this court, Sanford testified he attended the actual autopsy. Indeed, he said it was important to see bite marks *before* an autopsy, not *after*, if possible. We do not resolve this conflict.

3

The pathologist, Dr. George La Pointe Vandermark,[2] testified Todd had blunt-force injuries on both sides of her scalp.  He saw possible bite marks on her abdomen and buttocks and thought they should be examined by a dental specialist.  He did not think the poker, which was at the autopsy, likely caused all the blunt-force injuries.  The head injuries caused death.  There were two blows that could have caused the fractures, but all the fractures might have been caused by only one of those blows.  At least five blows were struck.  He said Dr. Sanford was not at the autopsy.  Dr. Vandermark did not think the mark near Todd's armpit was a bite mark.

Before receiving the DNA results, Detective Molthen questioned Gorman on March 30, 2005.  Gorman said he arrived in Stockton on the evening of March 24, 2005, stayed at his son's house, and left the next morning.  Gorman was a long-time friend of Todd's.  He had been at Todd's house about a month earlier, argued with her and her daughter Cleveland, was struck in the forehead by Todd, and pushed her away.  Molthen saw that Gorman had a "slight scar" on his forehead during the interview.  Gorman said the argument "turned slightly physical and he was . . . struck in the forehead by Miss Todd."  Gorman's girlfriend, Trisha Fields', house was searched, but nothing relevant was found except a newspaper article about the killing.  Officers went to Gorman's "parole address" in Sacramento, and found a baseball bat in a car trunk.

On November 8, 2005, eight months after the killing, Detective Eduardo Rodriguez learned that Michele Curtis, a friend of Todd's who had been arrested for theft, claimed to have information about the killing.

_____

[2]  Dr. Vandermark used to be named Dr. George Bolduc, a fact discussed in the record but inexplicably not revealed to the jury through cross-examination or otherwise.  In *People v. Dungo* (2012) 55 Cal.4th 608 at pages 613-615 and *People v. Beeler* (1995) 9 Cal.4th 953 at page 979, our Supreme Court described the unfavorable circumstances that may have led the former Dr. Bolduc to change his name.

After receiving the DNA report inculpating Gorman, Detective Rodriguez interviewed him on September 15, 2006, while he was under arrest. Gorman said he had grown up with Todd in a south Stockton neighborhood. He repeatedly said he and Todd were just friends, but eventually admitted they had "toss-up sex" whereby he gave Todd drugs in exchange for oral sex. The last time he had done this was sometime after he had been released from prison. He called Tinae Vaden his "step step" and said that "Pepper" Lockett, Vaden's mother, had been his girlfriend at one time. Gorman said he had last been to Todd's house about three or four weeks before the killing. He and Cleveland had argued, then Todd hit him in the head with a crack pipe. He denied biting Todd or spitting on anyone. He could no longer remember where he had been the night of the killing. When confronted with DNA evidence, Gorman said, " 'If you have a DNA sample, all that shit is gone anyway. It's over. It's a wrap[.]' " However, he also said, " 'My DNA on those bites? I doubt it.' " He also said the DNA report was " 'bullshit.' "

Curtis testified she was friends with Gorman, and the basis of the friendship was "money and drugs." When she finally went into drug rehabilitation, she still owed Gorman money for drugs. While in a car with him, Gorman told her he had fought with Todd a couple of weeks before and Todd hit him "with a pistol or something" and he had a bruise on his head. Also in the car were Lockett, now deceased, Vaden, who was driving, and "[a]nother guy" who "was a drunk." They were all smoking crack cocaine. Curtis had been addicted to cocaine and later heroin, and used both at that time. Todd's house was a known crack house, where drug usage could go on all night, and Curtis had met Todd at an "NA" meeting. Curtis "was on crack and heroin at the time" and undergoing heroin withdrawal; she had been up for eight days and "was sick and I was suffering from, you know, you can't smoke crack and you're sick from heroin because it makes you worse. So I was trying to get some heroin so I can get well. So I was falling

5

in and out of sleep because I was tired and at the same time, you know, I kept smoking the crack to stay [awake], tripping myself out, but messing myself up worse. I was in and out of sleep[.]" However, she woke up and knew she was outside Todd's house.

When the group parked, she and the others used drugs or drank, but Gorman got out of the car and went to the trunk, got a metal bat, and went to Todd's house, saying he was going "to get even or get back at her for what she did to him." Gorman always had a bat and was known as "Batman." When he returned, he was breathing hard, sweating, looked "roughed up," with blood and scratches on him, put the bat in the trunk, and "said he beat the bitch to death." He was also missing an earring Curtis identified as Gorman's at trial--the earring found beneath the body, which the prosecutor had only recently shown her. Curtis had four misdemeanor petty theft convictions--two in 2005 and two in 2009--and a felony petty theft with a prior conviction in 2010. A few weeks before trial, the prosecutor in Gorman's case spoke to the judge in Curtis's case, and her remaining jail time was converted to community service. Cross-examination illuminated inconsistencies between her testimony and prior statements, but she stuck to her essential story. She had decided to give her life "to the Lord," and told an investigator at her church about Todd's murder. However, she relapsed and continued to steal after revealing what she knew. Curtis testified that she remembered the past better than the present.

Gorman testified and denied killing Todd, or being at her house that night. He had been released from Solano Prison on February 5, 2005, after serving over two years for "[g]rand theft person." In February 2005 he spent significant time at Todd's house in Stockton, using crack cocaine. Although he initially lied to the police about it, he and Todd did have a sexual relationship, based on drugs for oral sex, which had predated his prison term and continued after his release. On March 7, 2005, he was at Todd's house, buying drugs from her daughter Cleveland, when they got into an argument, which escalated when Todd joined in, resulting in a pushing match, then Todd struck him in the

6

head with a crack pipe, causing him to bleed, then he grabbed her and for perhaps three minutes: "We kind of tussled a little bit on the ground." However, Gorman did not bite Todd. Nor did he harbor residual resentment about this incident. He never returned to Todd's house after that incident, but did visit Stockton twice more that March, once to appear in court for one of his sons, and then on the night of the killing, when he admitted he arrived in Stockton around 8 p.m. As Gorman was driving to see his daughter, his son James Gorman, Jr. (James), called him and asked him to listen to some music, at James's in-home studio in north Stockton. James would play some music, and Gorman would give his opinion about it. A young man named "McCoy" was with them. Gorman drank beer and fell asleep, waking up around 6:00 a.m. on March 25. He had to return the car to his ex-wife in Sacramento, and later that day he returned to Stockton to see his granddaughters, where he stayed with his daughter until Easter Sunday (March 27), then went back to Sacramento. He spoke with Detective Molthen on March 30, but was not arrested, although in April 2005 he began serving seven and a half months for a parole violation, involving a "domestic" matter with the mother of his sons. He served another parole violation sentence beginning around October 2005, for drunk driving. He had never carried a bat and was never known as "Batman."

The jury heard nine days of evidence beginning May 12, 2011. It heard closing arguments on May 31 and June 1, 2011.

During closing argument, the prosecutor emphasized the manner of death--multiple blunt-force hits to the head, manifesting intent to kill--and characterized the issue as the killer's identity. He relied on Gorman's DNA matching the DNA from Todd's jeans, the motive of revenge based on the prior fight, and Curtis's testimony regarding Gorman's actions the night of the murder. The prosecutor emphasized that "when someone offers on uncorroborated alibi, it's almost like an admission."

7

Cingcon gave a largely rambling closing argument. He emphasized the presumption of innocence and the People's high burden of proof. He also attacked Curtis's testimony, twice noting she had received favorable treatment in another case, pointed out the DNA expert could not tell *when* the DNA was deposited on the jeans, and pointed to discrepancies in the People's case. In response to the prosecutor's point that the alibi was uncorroborated, Cingcon argued Curtis's story, too, was uncorroborated. He argued that if he had brought James and Gorman's daughter in to testify, or to show the police Gorman was innocent, they would not have been believed, because they had an inherent motive to lie to protect their father.

In rebuttal, the prosecutor emphasized there was no corroboration for Gorman's alibi and no other plausible killer had been identified. Curtis's incentive to testify merely for lenient treatment was minimal.

The jury began deliberating the afternoon of June 1, and asked for the testimony of Curtis and Gorman to be read back, which was done on June 2 and June 3. The jury reached its verdicts the afternoon of June 3, 2011, acquitting Gorman of first degree murder, but convicting him of second degree murder. The trial court (Villapudua, J.) sentenced Gorman to prison for 15 years to life, and he timely appealed (*People v. Gorman*, 3 Crim. No. C068721).

B. *The Habeas Corpus Petitions*

On September 27, 2012, we denied Gorman's *first* original petition for writ of habeas corpus in this court, without prejudice to his filing it in the superior court. (*In re Gorman*, 3 Crim. No. C072011.) After the trial court denied Gorman's petition without reaching the merits,[3] Gorman filed a *second* original petition in this court (*In re Gorman*, 3 Crim. No. C073222), which we coordinated for oral argument with his appeal.

_____

[3] The trial court (Van Oss, J.) gave two invalid reasons for not reaching the merits. First, Gorman was represented by counsel on appeal. While a represented party must speak

8

The petition emphasized that Todd's daughter, Cleveland, was not present when the police arrived, but there was music playing and candles burning in her room, and her purse was found, albeit containing other people's credit cards and papers.

Cleveland gave inconsistent statements to the police, but eventually stated she had been selling cocaine when her mother was killed, and admitted her mother had stolen her drugs at unspecified times in the past. She said she last left the house after 1:00 a.m. after a conversation with her mother.

The police spoke with Troy Lawson, who told them that, shortly after the killing, he spoke to Cleveland while buying drugs from her, and when he asked her about her mother's death, Cleveland said, " 'Well, they're not going to catch me for that.' " A few days later, when Lawson again bought drugs from Cleveland, he asked her if they had found the killer, and Cleveland said, " 'I knocked her out. . . . She smoked up my shit and she got knocked out!' " Lawson's statements were contained in police reports available to Cingcon, but he was not called as a witness.

---

through counsel (see *People v. Clark* (1992) 3 Cal.4th 41, 173), we had not expanded Gorman's appellate counsel's authority to represent Gorman in the trial court. Instead we had stayed the appeal pending the outcome of the trial court habeas petition. Thus defendant was not represented in the trial court. Indeed, in his trial court petition, Gorman requested appointment of counsel. Second, the trial court reasoned that Gorman could not file a habeas corpus petition in the trial court raising the same issues as his direct appeal. To the contrary, our constitution vests the superior court with jurisdiction to consider a habeas corpus petition regardless of the existence of a pending appeal. (Cal. Const., art. VI, § 10; see *In re Carpenter* (1995) 9 Cal.4th 634, 645-646.) Indeed, the authority included in our order denying Gorman's first petition in this court made clear that Gorman was free to file his petition in the superior court. (See *In re Steele* (2004) 32 Cal.4th 682, 692 ["a reviewing court has discretion to deny without prejudice a habeas corpus petition that was not filed first in a proper lower court"]; *In re Hillery* (1962) 202 Cal.App.2d 293.) Thus there was no valid basis for the trial court to decline to adjudicate Gorman's trial court petition on the merits; by doing so it unnecessarily delayed resolution of this case.

Cleveland's alleged statements to Lawson were corroborated by the condition in which she left her room, as well as evidence that Todd had a drug pipe in her pocket and had "upper range" levels of cocaine in her system.

Eight months later, Michele Curtis, after her arrest for theft, told the police that on the night of the killing, she was in a car smoking crack cocaine with Gorman, Vaden, and Lockett. But *both* Vaden and Lockett denied Curtis's story, as stated in police report summaries prepared in 2005 and 2006. Cingcon did not hire an investigator until 2011, and made no effort to find Vaden or Lockett (who died in 2008) to refute Curtis's testimony.[4]

Cingcon was retained to represent Gorman and substituted in on September 28, 2006. The jury was sworn on May 11, 2011, and verdicts were reached on June 3, 2011. In his list of proposed trial witnesses, Gorman had listed Cleveland, Lawson, and James, but did not call any of them as witnesses. The jury deliberated over the course of three days before convicting Gorman of second degree murder.

Cingcon stated in a declaration dated March 20, 2012, that he cannot find his file pertaining to the Gorman case and does not know where it is. Appellate counsel's investigator, Rudy Alejo, described his efforts to obtain the file, without success. Thus, there are no extant notes or other attorney work-product that might corroborate claims

_____

[4] In a declaration attached to the return, Cingcon claims that "[i]n the months leading up to" trial, he "happened" to see Vaden and spoke to her "briefly about the case. She was extremely reluctant to testify" and "[a]s the trial approached, I had my investigator try to locate [Vaden], but he was unable to find her or any of the other persons Curtis claimed were in the car." There is no signed declaration by Cingcon's investigator, but Gorman's investigator declared he spoke with Cingcon's investigator, who described the work he did, which did *not include* searching for Vaden or Lockett. This minor factual conflict does not require resolution via a reference hearing. Assuming Cingcon did ask his investigator to look for Vaden, by his own declaration that was due to a chance encounter *shortly before trial*, although there is no dispute that he had the police reports reflecting Vaden's statements, contradicting Curtis's story, long before trial.

10

about Cingcon's trial strategy or preparation. His trial investigator refused Alejo's request to sign a declaration regarding what steps he took, because he did not want to sign anything " 'that disparages Cingcon' " and Cingcon "had told him not to sign anything[.]" However, he told Alejo that he had not been hired until April 28, 2011, and he had not been asked to look for Vaden or Lockett (who was already dead) or to locate alibi witnesses. And Cingcon stated on the record, *nine days* before trial, that he had not talked to *any* witnesses.

McCoy's declaration, which we describe in more detail *post*, states he was at James's house that night, and the younger men played music for Gorman in the garage, converted into a music studio. McCoy stayed up late with Gorman, then Gorman slept on one of the two couches, and after McCoy went to sleep "between 3:30 and 4:00 a.m., Mr. Gorman was still asleep on the couch inside the garage. When I awoke around 10:00 a.m. that morning," Gorman was gone. McCoy was never contacted by Cingcon, but declared that if called to testify "I would have told the jury about the evening I spent with James and Mr. Gorman."

James declared that Gorman was at his house that night, and slept in the garage on one couch, while McCoy slept on the other. The next day, James heard a rumor that " 'Mondo' " had killed Todd. Both Gorman and James were sometimes called " 'Mondo,' " but James knew *he* had not killed Todd, and he knew his father could not have killed Todd because he had been at James's house that night. James was never contacted by Cingcon or any investigator until after Gorman's appeal. Had he been contacted, he "would have been available to testify to my father's alibi."

Lawson's declaration confirmed that he had heard Cleveland's statements about her mother, which he understood to mean she had killed Todd. He admitted that his conversations with Cleveland occurred when he was buying drugs from her. He was never contacted by the defense until after the appeal, and if called "I would have testified

11

consistent with my statements to police." To show his availability, a private investigator filed a declaration stating it took her mere seconds to find Lawson's current address, using standard databases.

C. *The Return*

As pointed out by the traverse, the People's return is defective, as it does not dispute or accept any the facts alleged in the petition. It includes only a declaration by Cingcon, and a document showing James's criminal record.

Cingcon's declaration states he is an experienced criminal practitioner, and did not call Gorman's son because he was in prison and had prior convictions for sex crimes, therefore "I did not believe he would be a favorable witness." He did not call McCoy because "Gorman never gave me the name of this individual." Presumably, he meant Gorman never gave him McCoy's *full* name, because Gorman testified at trial about being with his son and a young man named "McCoy" the night of the killing. Cingcon could not find Cleveland. He did not call Lawson "because I knew he would not be able to testify to hearsay statements made by Cleveland."

Thus, the return alleges facts that might have impeached James's testimony, but does not deny that Cingcon failed to interview James or Lawson (personally or through an investigator), and made no effort to find McCoy.

D. *The Traverse*

Gorman declared that "[s]hortly after" his family retained Cingcon, before the preliminary hearing, he told Cingcon where he had been around the time of the killing, consistent with his trial testimony, that he had been with James and "McCoy" the night of the killing.

James declared he had been in prison during his father's trial, but had hoped and expected to be called to testify on his father's behalf. He would have cooperated with his father's counsel, and provided McCoy's full name and contact information, but Cingcon

12

"never talked to me, even once, about my father's case." "Had I been called as a witness at trial, I would have told the jury that my father was with me and Adrian McCoy at the time of the crime."

## DISCUSSION

### I

*Legal Standards on Habeas Corpus*

A criminal defendant is entitled to the effective assistance of counsel, whether appointed or retained. (See *Cuyler v. Sullivan* (1980) 446 U.S. 335, 344-345 [64 L.Ed.2d 333, 344]; *People v. Montoya* (2007) 149 Cal.App.4th 1139, 1147.)

Substantively, a claim that counsel's performance was constitutionally ineffective in a given case has two elements. First, the defendant must show counsel acted below the standards of professional competence. "[T]he defendant can reasonably expect that in the course of representation his counsel will undertake only those actions that a reasonably competent attorney would undertake. But he can also reasonably expect that before counsel undertakes to act at all he will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation. [Citations.] If counsel fails to make such a decision, his action—no matter how unobjectionable in the abstract—is professionally deficient." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215 (*Ledesma*).) Second, the defendant must show there is a reasonable probability he would have obtained a more favorable result in the absence of counsel's failings. (*Id.* at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at p. 694 [80 L.Ed.2d at p. 674]; see *In re Marquez* (1992) 1 Cal.4th 584, 603 (*Marquez*).) But, "[t]he likelihood of a different result must be substantial, not just conceivable." (*Harrington v. Richter* (2011) 562 U.S. ___ [178 L.Ed.2d 624, 647] (*Harrington*).)

13

Procedurally, facts alleged in the petition not contested by the return are deemed true, and facts alleged in the return not contested by the traverse are deemed true. (See *People v. Duvall* (1995) 9 Cal.4th 464, 476-478 (*Duvall*); 6 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Writs, § 90, pp, 708-709; Cal. Rules of Court, rule 8.386(c)(3) & (d)(3).) If material factual disputes remain, we may order a reference hearing to resolve them. (*Duvall*, *supra*, 9 Cal.4th at pp. 478-479; see *In re Freeman* (2006) 38 Cal.4th 630, 635 [standard of review over referee's findings].) However, no reference hearing is required in this case, as the material undisputed facts are sufficient for us to make the required determinations.

Here, for purposes of oral argument, we have coordinated the appeal and the habeas corpus proceeding. In the latter, both parties make liberal references to the trial record. Because both parties seem to agree this is proper, we will at times refer to trial evidence relevant to albeit not embraced by the habeas pleadings, although we do not reach the merits of the appeal. (See, e.g., *County of El Dorado v. Misura* (1995) 33 Cal.App.4th 73, 77 [where counsel agree, appellate court may accept facts as true].)

II

*Cingcon's Representation of Gorman*

In two respects, Cingcon failed to produce available evidence to bolster Gorman's case. Contrary to the People's view, we cannot find these failings were "rational and informed decision[s] on strategy and tactics founded on adequate investigation and preparation." (*Ledesma, supra,* 43 Cal.3d at p. 215.)

A. *Third Party Culpability Evidence:  Lawson's Testimony*

Lawson was prepared to testify that Cleveland, Todd's daughter--who apparently fled the murder scene, leaving music playing and candles burning in her room--admitted violence against Todd on the night of the murder, referencing "knock[ing] [Todd] out," and saying she would not get caught, in response to questions by Lawson about the killing. This testimony, if believed, strongly suggested Cleveland killed Todd. It

14

provided more than "mere motive or opportunity" by Cleveland to kill her mother. (*People v. Hall* (1986) 41 Cal.3d 826, 833)

The People point to Cingcon's declaration that Lawson's statement was hearsay,[5] and share his view.  We disagree with this view, as a matter of law.

Evidence Code section 1230 provides in part:

> "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

"A party who maintains that an out-of-court statement is admissible under this exception as a declaration against penal interest must show that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character. [Citation.]  To determine whether the declaration passes the required threshold of trustworthiness, a trial court 'may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' "  (*People v. Cudjo* (1993) 6 Cal.4th 585*,* 607; see *People v. Duarte* (2000) 24 Cal.4th 603, 610-612.)

There is no dispute that Cleveland could not be located by either party, and thus was unavailable.  The statements were clearly inculpatory, as they were each made in response to Lawson's inquiries of Cleveland regarding her mother's killing and they suggested Cleveland's culpability for the killing.  They were sufficiently reliable-- assuming Lawson's evidence is credited--because Cleveland inculpated herself equally on two separate occasions, in response to questions about her mother's death.  Nothing in

_____

[5]  Cingcon declared that he lost his case file, and did not claim that he researched this issue, merely that he "knew" Lawson's testimony was inadmissible.

the record shows her relationship with Lawson or Gorman would cause her to make such statements falsely. And nothing in the record suggests any other plausible motivation for Cleveland to falsely inculpate herself by stating she had knocked out her mother that night and the police would not "catch" her for doing so. A reasonably competent attorney would have called Lawson to testify about Cleveland's statements, to offer the jury a plausible third-party killer.

B. *Corroborating the Alibi; Gorman's Son and Adrian McCoy*

Cingcon declared he did not call Gorman's son because he was a prisoner with a record of sex crimes. However, Cingcon did not interview the son and therefore had no way to evaluate his credibility. Other witnesses, including the People's "star" witness, Curtis, were highly impeachable. The jury learned Gorman had been convicted of grand theft from the person in 2002, had been released from prison in February 2005 and was on parole at the time of the killing, and served two parole violation terms after the killing. And, as the trial judge noted pretrial, "All the witnesses are involved in drugs, selling drugs, doing drugs." Given the nature of Todd's lifestyle and companions, at a minimum Cingcon should have interviewed James and it was below the standard of care not to do so. (Cf. *Lord v. Wood* (9th Cir. 1999) 184 F.3d 1083, 1093-1096 & fns. 8 & 9 (*Lord*) [it may be rational to decline to call purportedly exculpatory witnesses, *where trial counsel has interviewed them* and found they lacked credibility].) Indeed, the People cite authority pointing out that "[w]hether to call certain witnesses is . . . a matter of trial tactics, *unless the decision results from unreasonable failure to investigate*." (*People v. Bolin* (1998) 18 Cal.4th 297, 334, emphasis added.) In particular, given that Curtis continued to steal after her supposed religious conversion, it was not reasonable to write James off as a witness without even an interview simply because he had a criminal record.

And, critically in this case, interviewing James would have led Cingcon to McCoy, a witness who (so far as the record shows) had an unblemished record. McCoy would have testified, too, that Gorman was at James's house the night of the killing.

The People partly rely on Cingcon's declaration that Gorman did not give him McCoy's full name. But if Cingcon had interviewed James, James would have provided McCoy's first name. Cingcon's ignorance of McCoy's identity flowed ineluctably from his failure to interview James.

The People also point out, correctly, that McCoy did not recall the precise date in March when he was with Gorman at James's house. But the fact he was there when James was playing music mixes for Gorman dovetails with Gorman's trial testimony and James's declaration about which night McCoy was there. Further, McCoy's declaration in part states he was James's close friend, and Gorman was listening to music tapes the younger men had made, until Gorman went to sleep on one of two couches in the garage. McCoy continues: "I remember that night well because this was only the second time I had met Mr. Gorman, and I have not seen him since. When James told me in 2006 that people were accusing his father of killing someone that night, I knew it was not true because he spent the night sleeping on a couch inside of a garage only a few feet away from me." So, although McCoy did not recall the *date,* and while the prosecutor would have been free to challenge McCoy's veracity and the accuracy of his recollection at trial, his declaration is sufficiently detailed, when linked with Gorman's trial testimony and Gorman's son's declaration, to show that he referred to the night of Todd's killing.

McCoy's testimony also would have mitigated the effect of impeachment evidence available to the People against James, viz., his criminal record. James and McCoy together would have provided "mutually reinforcing statements" (*Lord*, *supra*, 184 F.3d at p. 1094), corroborating the otherwise wholly *un*corroborated alibi.

17

Thus, we find Cingcon performed below the standard of competence by not contacting James, who would have led him to McCoy, thus providing Gorman with two alibi witnesses with interlocking stories, instead of leaving the jury with the wholly uncorroborated alibi of Gorman.**6**

### III

### *Confidence in the Verdict*

We turn to the effect of Cingcon's failings, that is, whether it is reasonably probable Gorman would have achieved a better result in the absence of these failings. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at p. 694 [80 L.Ed.2d at p. 698]; see *Marquez*, *supra*, 1 Cal.4th at p. 603.) In doing so, we keep in mind that "there is no way to ever define just what quantum of evidence is necessary to convince a jury beyond a reasonable doubt of a defendant's guilt." (*People v. Accardy* (1960) 184 Cal.App.2d 1, 4.) And to obtain a better result, the defense merely needed to raise a reasonable doubt in the mind of one juror, to obtain at least a mistrial on the second degree murder charge. (See *People v. Soojian* (2010) 190 Cal.App.4th 491, 518–521.)

Curtis's credibility was dubious at best, given her belated report of relevant events, and the fact she had been awake for eight days, was withdrawing from heroin, high on crack, and nodding in and out of consciousness when she supposedly saw Gorman enter Todd's house with a bat and return, stating he had killed Todd. Further, she continued to steal after her purported religious conversion which led her to report her story, and received some form of lenity for her testimony. No blood or fingerprint evidence connected Gorman with the bat or Todd's house. The experts could not tell when his DNA got on her jeans, and washing the jeans would not necessarily eliminate it. Given

_____

**6** For the reasons explained in Part III, *post*, we need not consider other alleged deficiencies about Cingcon's performance debated by the parties.

that Gorman regularly had sexual contact with Todd, and had "tussled" with her on their last visit, in *this* case a DNA "match" was not as persuasive as such a match sometimes can be. Indeed, the jury asked for re-reading of the testimony of Curtis and Gorman, and deliberated over a three-day period. This shows the jury did not view the DNA evidence as dispositive.

The jury did *not* hear evidence that Cleveland, who was at the house immediately before the murder, twice made admissions indicating she killed her mother. Nor did the jury hear from two mutually consistent witnesses--one of whom was of unimpeachable character so far as this record shows--who would have corroborated Gorman's alibi. The utter lack of corroboration of Gorman's alibi was emphasized in argument by the prosecutor.[7]

Under these circumstances, there is a reasonable probability Gorman could have obtained a better result in the absence of counsel's failings. The "likelihood of a different result" in this case, is "substantial, not just conceivable." (*Harrington*, *supra*, 562 U.S. at p. ___ [178 L.Ed.2d at p. 647].) Accordingly, Gorman has demonstrated that he is entitled to a new trial.

_____

[7] Given the trial evidence, it was entirely appropriate for the prosecutor to emphasize this point.

**DISPOSITION**

The petition for writ of habeas corpus is granted.  The judgment is vacated, and the cause remanded to the trial court for a new trial.  The Clerk/Administrator of this court shall forward copies of this opinion to the State Bar of California and to Ralph Cingcon, Esquire.  (See Bus. & Prof. Code, § 6086.7, subds. (a)(2) and (b).)  The appeal from the judgment is dismissed as moot.


        DUARTE        , J.


We concur:


     RAYE        , P. J.


     MAURO       , J.