Filed 6/8/26  P. v. Romero CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAIME DEMECIO ROMERO,<br><br>    Defendant and Appellant. | H053210<br>(Monterey County<br> Super. Ct. No. 19CR000358) |
| In re JAIME DEMECIO ROMERO,<br><br>    on Habeas Corpus. | H053790<br>(Monterey County<br> Super. Ct. No. 19CR000358) |

Defendant Jaime Demecio Romero, a life prisoner, was convicted by a jury of second degree murder.  A codefendant, Alberto Sanchez Cortez, was convicted of first degree murder and assault by a life prisoner.[1]  The trial court sentenced Romero to a term of 45 years to life plus 16 years.

---

[1] A different panel of this court affirmed Sanchez Cortez's convictions. (*People v. Sanchez Cortez* (Dec. 11, 2025, H052814) [nonpub. opn.].)

On appeal, Romero argues that his trial counsel was ineffective for failing to seek to admit a purported suicide note written by Sanchez Cortez as a prior consistent statement.[2]  We disagree.

As explained below, we need not address whether trial counsel's failure to seek admission of the note as a prior consistent statement was deficient performance, because Romero cannot show a reasonable probability of a more favorable outcome had trial counsel sought and obtained its admission.  We will affirm the judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural background

On February 28, 2024, the Monterey County District Attorney filed an amended information charging Romero with first degree murder (Pen. Code,[3] § 187, subd. (a); count 1).  The amended information further alleged that Romero personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)) in committing the offense charged in count 1 and that Romero had three prior strike convictions (§§ 667, subd. (a)(1), 1170.12, subd. (c)(2)) as well as three prior serious felony convictions (§ 667, subd. (a)(1)).

On May 31, 2024, a jury convicted Romero of second degree murder, finding that he did not act willfully, with premeditation and deliberation.  The jury also found true the allegation that he personally used a deadly weapon in committing the murder.  In a bifurcated proceeding, the court found true the prior strike and prior serious felony allegations.

---

[2] Romero has filed a petition for writ of habeas corpus (H053790) that this court ordered considered with the appeal.  We have disposed of the habeas petition by separate order filed this day.  (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

[3] Unspecified statutory references are to the Penal Code.

After denying his motion for a new trial and his *Romero*[4] motion, the trial court sentenced Romero to a term of 45 years to life (15 years to life, tripled due to his prior strikes) consecutive to a term of 16 years (one year for the personal use enhancement plus five years for each of his three prior serious felony convictions). The court stated that Romero's sentence was to be "served consecutive to any other sentence [he] is currently serving."

Romero timely appealed.

### B. Facts

#### 1. Prosecution case

##### a. Correctional officers' testimony

On January 12, 2018,[5] correctional officer Jose Carmona was working as the control booth officer at Facility B-4 in Salinas Valley State Prison (SVSP).[6] As the control booth officer, Carmona could unlock the cell doors electronically, but those doors had to be physically closed by inmates or correctional officers. Once closed, the doors automatically lock.

At 11:15 a.m., Carmona gave a five-minute warning to the inmates in the dayroom to return to their cells. Carmona unlocked Cells 101 to 117 for the inmates assigned to those cells.

At approximately 11:21 a.m., the floor officers called out an alert that there was a fight in a cell. As directed by Sergeant Mario Barroso, Carmona opened the door to Cell 112, which was assigned to the victim Alcantar Ortega. According to Carmona, Alcantar Ortega did not have a cellmate. Carmona went to assist Barroso and began pulling Alcantar Ortega, who was lying on the floor by the

---

[4] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

[5] Unless otherwise specified, all dates are from 2018.

[6] SVSP is designated as a "high security" prison.

door, out of the cell.[7] Carmona saw Romero and Sanchez Cortez inside Cell 112, but he had not seen either of them enter that cell.

On January 12, correctional officer Lucio Cuevas was working as a yard officer at SVSP. At approximately 11:21 a.m., the incident alarm went off in the yard of B-4. Cuevas responded and, as he scanned the area inside B-4, Cuevas saw "blood in … Cell 112. … on the floor [coming from under the door] and smeared in the window of the door." When Cuevas looked through the cell window, he saw Alcantar Ortega, who "had visible injuries and blood," "lying face up … [on the floor with] his head near the door." Cuevas also saw Romero and Sanchez Cortez inside the cell, by Alcantar Ortega's feet, and both "had bloodstains [on their clothing.]" On cross-examination, Cuevas said that Romero and Sanchez Cuevas had "about the same" amount of blood on their clothing.

Once the door to the cell was unlocked, Cuevas dragged Alcantar Ortega, who was not moving, out of the cell. Cuevas closed the door and waited for additional staff before he handcuffed and removed Romero from the cell. Cuevas escorted Romero to the dayroom and guarded him there before turning him over to staff from the Investigative Services Unit (ISU).

Correctional officer Seth Puckett was working as a floor officer in Facility B-4 at SVSP on January 12. At approximately 11:21 a.m., Puckett heard a "loud bang on … one of the doors, and … heard a 'man down' come from one of the cells." Puckett noticed blood on one of the cell's windows and blood seeping under the door, so he alerted his partner there was a possible cell fight and activated his alarm.

---

[7] On cross-examination, Carmona said he saw Alcantar Ortega get "dragged out" after which Romero and Sanchez Cortez were removed from the cell.

4

When Puckett reached the door to Cell 112, he could not see inside as it was dark, and the back window was covered. Puckett used his flashlight and saw Romero and Sanchez Cortez standing in the middle of the cell looking toward the door. Puckett knew that Alcantar Ortega was assigned to that cell and Romero and Sanchez Cortez were not.[8] Puckett could not see Alcantar Ortega inside the cell, but he waited for additional staff to respond before opening the door.

Puckett's supervisor, Sergeant Barroso, arrived on scene and ordered the control booth officer to unlock the cell door. When the door opened, Puckett saw Alcantar Ortega lying on the floor "lifeless" with multiple injuries to his face and upper body and "a lot of blood."

Puckett's partner helped Cuevas pull Alcantar Ortega out of the cell so he could receive medical attention. Sergeant Barroso ordered Romero and Sanchez Cortez to face the back of the cell, put their hands behind their backs, and step backwards out of the cell one at a time. As each inmate exited the cell, they were handcuffed and placed against a wall for evidence collection.

Lieutenant Barroso[9] responded to the report of a fight in Facility B-4 on January 12. When he arrived on scene, Barroso saw Puckett and another correctional officer in front of Cell 112. Barroso could see blood seeping underneath the door to that cell and blood spatter on the window. Through the window, Barroso saw two inmates standing at the back of the cell, looking toward the door, and a third inmate lying motionless on the floor. Barroso directed the control officer to unlock Cell 112 and, after the door was pulled open, he directed the two inmates standing inside to face the back wall of the cell and put their

---

[8] Puckett, after reviewing his report, testified that Sanchez Cortez was assigned to Cell 119 and Romero was assigned to Cell 125.

[9] Barroso clarified that he was a sergeant at the time of the January 12 incident.

5

hands behind their heads. Barroso also told the other correctional officers to remove the injured inmate from the cell. After the third inmate was outside receiving medical attention, Barroso had correctional officers remove the other two inmates, one by one, from the cell and place them in restraints. Barroso identified Sanchez Cortez and Romero in court as those two inmates.

According to Barroso, when he first looked into the cell, Sanchez Cortez had "kind of a just a crazy smile," whereas Romero was shaking and looked shocked. Barroso observed that both inmates' hands were "trembling and shaking." He did not see either inmate holding a weapon. The inmates were covered in blood and, as they stood there, Barroso saw Sanchez Cortez use his thumb to wipe something off Romero's head.

In the ensuing investigation, a correctional officer photographed the inside of the cell after Romero and Sanchez Cortez were removed, documenting the blood on various objects in the cell, as well as two inmate-manufactured weapons discovered in the toilet. The weapons were admitted into evidence and exhibited to the jury.

Another officer photographed Romero and Sanchez Cortez. Sanchez Cortez had "quite a bit of blood" on his clothing and his person, with blood spatter on his face, hands, wrists, forearms, stomach, and front lower body. Romero had blood on his forehead, eye, hands, shoes, and knee. The photographs of Sanchez Cortez and Romero were exhibited to the jury and admitted into evidence.[10] The officer taking the photographs did not observe any injuries of note on either Sanchez Cortez or Romero.

---

[10] As depicted in the photographs, Romero had a significant amount of blood on his hands, including under his fingernails, and the tops of his shoes.

After Alcantar Ortega was transported to the hospital, a correctional officer searched his clothing but found no weapons. Alcantar Ortega was taken off life support and pronounced dead at 5:52 p.m.

### b. Autopsy evidence

Dr. Venus Azar, a forensic pathologist with the Monterey County Coroner's office, testified as an expert in forensic pathology. Dr. Azar performed the autopsy on Alcantar Ortega on January 18 and noted that medical personnel had placed 220 "staples or sutures" in attempting to treat his injuries.

In all, Alcantar Ortega had more than 70 "sharp force injuries," which includes stab wounds and incision wounds. Dr. Azar counted 17 stab wounds on Alcantar Ortega's head, one of which "penetrated into the cranial cavity."[11] Alcantar Ortega had 12 stab wounds to his neck, most of which were superficial, but one "puncture[d] or involve[d]" his jugular vein. Dr. Azar noted 20 stab wounds and 15 skin incisions or punctures on Alcantar Ortega's torso. One of the stab wounds on his torso punctured his left lung, collapsing it. Finally, Alcantar Ortega had three stab wounds to his right arm or shoulder and nine stab wounds to his right thigh and leg. The deepest stab wound to his leg was seven inches in depth.

Dr. Azar determined that the cause of death was multiple stab wounds, and the manner of death was homicide. Her opinion was based on the fact that Alcantar Ortega "was bleeding profusely" on his arrival to the hospital, as well as the injuries to major blood vessels in his head and neck, and the injury to his left lung.

---

[11] Dr. Azar subsequently testified that two stab wounds "penetrated … into the cranial cavity[,] … [where] they severed a major blood vessel that supplies the brain with blood."

### 2. Defense case

#### a. Sanchez Cortez's testimony

Prior to Sanchez Cortez taking the witness stand, the court informed the jury that the parties stipulated that, at the time of the stabbing, Sanchez Cortez was serving a life term in prison.

Sanchez Cortez testified that, on January 12, he was returning to his cell from the dayroom when he encountered Alcantar Ortega who "didn't want to go into his cell for whatever reason." Sanchez Cortez admitted that his cell, Cell 119, was not on the same side of the tier as Cell 112 and was "about 30 yards away." When the floor officers told Alcantar Ortega to go into his cell, he did not comply. Sanchez Cortez said the floor officers "kind of looked around" and "wanted to go on with their job" so Sanchez Cortez "voluntarily went [to Alcantar Ortega's cell] to assist them."[12]

Sanchez Cortez walked over to Alcantar Ortega and told him, "two, three, four times," " 'Get into your cell.' " Alcantar Ortega refused to do so and began arguing with Sanchez Cortez. Each time Alcantar Ortega refused, he got louder and "more aggressive." Sanchez Cortez told Alcantar Ortega that it was " 'not up for argument' " and that he needed to get in his cell so " 'program can continue.' " Sanchez Cortez testified that if the inmates "hold up program," the correctional officers will get them in trouble.

Sanchez Cortez said that the argument "led to an altercation" and he and Alcantar Ortega began to fight. Sanchez Cortez was "pretty sure" he threw the first punch. Alcantar Ortega punched Sanchez Cortez in the lip, and Sanchez Cortez "got pretty mad."

---

[12] Sanchez Cortez testified that, on January 12, Alcantar Ortega was a "northerner" like himself and Romero. However, at the time of trial, Romero was no longer a northerner.

Sanchez Cortez had two knives in his pocket, explaining it was "not unusual for people to carry weapons" given that it was a "Level IV prison." Sanchez Cortez pulled out one of his knives and stabbed Alcantar Ortega in the throat because "he's bigger than me." Sanchez Cortez said he "stabbed [Alcantar Ortega] repeatedly on the tier." They ended up inside Alcantar Ortega's cell "where we were just going at it, just me and him, one on one." Alcantar Ortega was "throwing punches back." Sanchez Cortez "stabbed him again and again and again and again" inside the cell and stabbed him "everywhere." Alcantar Ortega slipped and fell but Sanchez Cortez "let him get back up" and they continued to fight. Sanchez Cortez "continued to stab him[] [¶] [and] [] didn't stop."

Alcantar Ortega fell on the bunk and Sanchez Cortez "jumped on him[] [a]nd [] stabbed him some more. … maybe in the back of the neck or in the back." When Alcantar Ortega ran for the door, which was shut, Sanchez Cortez "stabbed him [] in the back of the neck" and stabbed him "[m]aybe" more than 15 times. Alcantar Ortega fell to the floor and Sanchez Cortez "stabbed him a few times while he was down." Sanchez Cortez stabbed Alcantar Ortega in "the nape of his neck and pulled [his knife] upwards." Sanchez Cortez said that he was not trying to kill Alcantar Ortega but was trying "to stop him." Alcantar Ortega got up and threw "a couple more punches," fell back to the floor when Sanchez Cortez punched him again, at which point "everything was just over."

After "everything kind of [] settled down," Sanchez Cortez heard a loud bang which was the cell door closing. Sanchez Cortez denied closing the cell door. Sanchez Cortez turned and saw Romero, who was yelling at him, " 'Stop, stop, stop.' " At that point, Sanchez Cortez "came to" and saw Alcantar Ortega on the floor. Sanchez Cortez's adrenaline was still pumping and he and Romero stood there for "probably 15 minutes, maybe longer." Romero looked scared, and

9

Sanchez Cortez testified that he may have laughed at him. Sanchez Cortez said that Romero did not do anything besides "run in there and try to stop the fight."

Sanchez Cortez told Romero, " 'Damn, you got blood on you. Like, my bad.' " He then used his fingers to wipe the blood on Romero's head. Sanchez Cortez took his two knives and threw them both in the toilet, but they were too big to flush.

The correctional officers then showed up, removed them from the cell, and asked them what happened. Sanchez Cortez said that, once the cell door opened, Alcantar Ortega crawled out "really fast" on his own.

### b. Romero's testimony

Romero testified that he was heading back to his cell from the dayroom when he saw Alcantar Ortega and Sanchez Cortez "facing each other" in front of Cell 112. Romero did not hear what they were discussing but saw them start fighting and go into Cell 112. He walked over to Cell 112 because he knew that Sanchez Cortez "gets mad easily."

Romero got to the cell and saw the two men exchanging blows, but he did not see a knife in anyone's hand. He was telling the men to stop fighting but when he saw "an object" in Sanchez Cortez's hand, Romero backed away inside the cell. Romero looked for a way out but saw that the door was closed. Romero did not close the door and did not see that Alcantar Ortega or Sanchez Cortez closed it. He tried to stay out of the way until correctional officers arrived and remembered "[t]here was a lot of blood." Romero saw Sanchez Cortez stab Alcantar Ortega multiple times, "all over the body towards the neck, head, back, shoulder." At some point, Sanchez Cortez or Alcantar Ortega bumped into Romero, causing him to lose his balance. Romero put his hands out to break his fall and noticed blood on the floor.

10

After Alcantar Ortega was on the ground, Romero saw Sanchez Cortez throw something in the toilet as correctional officers came in. Romero saw Alcantar Ortega try to crawl out of the cell before he was pulled out by a correctional officer. Sanchez Cortez came toward him, and Romero froze, thinking Sanchez Cortez was going to hurt him. Instead, Sanchez Cortez rubbed at something on his head, saying " 'You got blood on you.' "

At the time of the stabbing, Romero had a release date and was not serving a life sentence.

### 3. *Rebuttal*

Carmona testified, during recall, floor officers are "observing the inmates walking toward[] [their cells]" and, once the inmates are inside, the floor officers "start locking [] the doors." As the inmates moved from the dayroom, Carmona was focused on making sure they were walking to their cells since "[a]nything [] might happen." He did not see Alcantar Ortega and Sanchez Cortez fight nor did he see floor officers have any issue with Alcantar Ortega refusing to enter his cell. Based on his experience, there could not have been a fight outside a cell in the middle of the section without himself or a floor officer observing it. On cross-examination, Carmona said that he did not see anyone in front of Cell 112, nor did he see anyone enter that cell, as he was focused on the floor officers "closing down the cells."

## II. DISCUSSION

Romero argues his trial counsel provided constitutionally ineffective assistance. Specifically, Romero contends counsel should have argued that a note written by Sanchez Cortez before trial, in which he took sole responsibility for Alcantar Ortega's murder and denied that Romero participated in any way, was admissible as a prior consistent statement. In Romero's view, Carmona's

11

testimony on rebuttal "impliedly attacked [Sanchez] Cortez's credibility," thereby rendering the note admissible under that exception to the hearsay rule.

The Attorney General contends that Romero has failed to demonstrate that trial counsel was ineffective because the hearsay statements in Sanchez Cortez's note did not qualify as prior consistent statements under Evidence Code section 791, subdivision (b). Alternatively, the Attorney General argues that Romero cannot show he was prejudiced by exclusion of the note.

As explained below, even assuming that trial counsel was ineffective as Romero argues, we agree with the Attorney General that Romero cannot establish prejudice.

### A. Additional background

"On February 21, 2024, correctional officers began gathering inmates, including Defendant [Sanchez] Cortez for court. Defendant [Sanchez] Cortez shouted to the officer that he wasn't going anywhere and had a sheet drawn across the cell window, blocking officers' view and the cell lights were off. Officers called to him again and he repeated that he wasn't going. Officers heard Defendant Sanchez Cortez moaning, and he then stopped responding to officers. They looked inside and saw blood spatter on the floor of the cell and the sheet. Officers observed lacerations on his arms which appeared to be self-inflicted and pools of blood on the mattress. A razor blade used to inflict the injuries and a handwritten note was found. The note stated: [¶] 'To my wife N Family I am so sorry but fuck this life it aint living. I confess to the 2018 187. Creeper didn't do nothing.' "[13] (*Sic*.)

Before trial, the prosecution moved in limine to exclude the note written by Sanchez Cortez as inadmissible hearsay. Romero's counsel moved in limine to

---

[13] This recitation is taken verbatim from the prosecution's motion in limine.

admit the note, arguing that it is not hearsay or, alternatively, that it is admissible as a statement against penal interest.

At the hearing on motions in limine, the trial court indicated that the note would only be relevant if Romero was "Creeper" and was being offered for the truth of the statement that Romero did not participate in the murder.

In her argument, defense counsel contended the note was admissible under the declaration against penal interest exception to the hearsay rule (Evid. Code, § 1230). The prosecution argued that there were no applicable exceptions to the hearsay rule, and the note was therefore inadmissible.

The trial court concluded that the note was hearsay and that the declaration against penal interest exception did not apply. Specifically, the court found that the statement "Creeper didn't do nothing" was not against Sanchez Cortez's penal interest nor were there other indicia of reliability to support admitting it. Sanchez Cortez's counsel then inquired whether the court would allow the note to come into evidence as a prior consistent statement if his client "were to testify and [Sanchez Cortez] were to take responsibility [for the murder]." The court replied that it would consider doing so, but it "would want to see the parties [] brief that."

### B. Applicable legal principles

The standard for evaluating claims that counsel provided constitutionally ineffective assistance is set forth in *Strickland v. Washington* (1984) 466 U.S. 668, 687–694 (*Strickland*). This standard provides that: "[t]o secure reversal … upon the ground of ineffective assistance of counsel under either the state or federal Constitution, [an appellant] must establish (1) that [] counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that [appellant] would have obtained a more favorable result absent counsel's shortcomings. [Citations.]" (*People v.*

13

*Cunningham* (2001) 25 Cal.4th 926, 1003, citing *Strickland*, *supra*.) "A reviewing court can begin an ineffective assistance of counsel inquiry with either element and need not address both elements if one is not satisfied. [Citations.] Indeed, it is often preferable for a court to dismiss an ineffective assistance of counsel claim solely for lack of prejudice. [Citations.]" (*In re Tellez* (2024) 17 Cal.5th 77, 88 (*Tellez*).) With regard to the prejudice prong of ineffective assistance of counsel, " '[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*In re Marquez* (1992) 1 Cal.4th 584, 603 (*Marquez*).) "When there has been no showing of prejudice, we need not determine whether trial counsel's performance was deficient. [Citations.]" (*Id*. at p. 602.)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

### C. Analysis

#### 1. Trial counsel's performance

Only relevant evidence is admissible. (Evid. Code, § 350.) Under the Evidence Code, hearsay is defined as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is *offered to prove the truth of the matter stated*." (Evid. Code, § 1200, subd. (a), italics added.) Unless the hearsay evidence falls within an exception to the hearsay rule, an out-of-court statement is inadmissible for its truth. (*Id.*, subd. (b).) There is no dispute that the note in question is hearsay.

Under Evidence Code section 1236, "[e]vidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is

14

consistent with his testimony at the hearing and is offered in compliance with Section 791." Evidence Code section 791, subdivision (b) provides that a prior consistent statement may be admitted to support the credibility of a testifying witness if "[a]n express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

As stated earlier, Romero argues that Carmona's rebuttal testimony "created an inference [Sanchez] Cortez had fabricated his account of the fight" which amounted to an implied charge that Sanchez Cortez's trial testimony was recently fabricated. We need not decide whether Sanchez Cortez's note qualifies as an admission under Evidence Code section 791, subdivision (b). As discussed below, assuming without deciding deficient performance by trial counsel for failing to seek admission of the February 2024 note written by Sanchez Cortez as a prior consistent statement, Romero has not met his burden on direct appeal that there was a reasonable probability of a more favorable outcome.

### 2. Romero has not shown prejudice

Our Supreme Court has instructed that, when addressing a claim of ineffective assistance of counsel, "[a] reviewing court can begin … [that] inquiry with either element [i.e., counsel's deficient performance or prejudice] and need not address both elements if one is not satisfied. [Citations.]" (*Tellez*, *supra*, 17 Cal.5th at p. 88.) For the purposes of this discussion, we will assume that trial counsel requested admission of the suicide note as a prior consistent statement and the trial court admitted it into evidence. Because Romero has not shown, even under such a circumstance, " '[a] reasonable probability … sufficient to undermine confidence in the outcome[,]' [citations]" (*Marquez*, *supra*, 1 Cal.4th at p. 603), his claim of ineffective assistance of counsel is without merit.

15

As discussed earlier, when correctional officers arrived at Cell 112, the cell door was closed and locked. It was undisputed that only the inmates themselves or correctional officers could close and lock the cells once they had been unlocked by the control officer. Sanchez Cortez and Romero were inside the cell, and Romero had blood on his forehead, eyes, hands, shoes, and knee.[14] Alcantar Ortega had been stabbed more than 70 times, and two inmate-manufactured weapons were discovered inside the toilet.

Romero argues that there was no evidence to support the prosecution's theory that he participated in the murder, explaining that there was no *affirmative* evidence to show who closed the cell door, how he was spattered with blood, or that he used either of the weapons found in the toilet. We disagree. There was ample evidence from which the jury could have reasonably found that Romero participated in the murder. While Romero testified, he became trapped inside Alcantar Ortega's cell by happenstance as he sought to stop the fighting between Sanchez Cortez and Alcantar Ortega, there was considerable circumstantial evidence which established his active participation in the murder. Correctional officers discovered two inmate-manufactured weapons in the cell and the jury was entitled to disbelieve the testimony that Romero did not use either of those weapons. The sheer number of stab wounds, more than 70, suggests that they were inflicted by more than one person. The amount of blood on Romero's person, especially his hands, including beneath his fingernails, and on the tops of his shoes, also supports the jury's conclusion that he was directly engaged in the repeated stabbing of Alcantar Ortega.

Against the relatively strong evidence of Romero's culpability described above was the relatively weak evidence favoring his version of events, which

---

[14] See footnote 11, *ante*.

16

consisted of: (1) Romero's testimony that he only ended up in Alcantar Ortega's cell because he tried to stop Sanchez Cortez from fighting; and (2) Sanchez Cortez's direct testimony that Romero did not participate in the killing. Sanchez Cortez's suicide note was cumulative to Sanchez Cortez's trial testimony and would have added little to the jury's evaluation of the evidence. Moreover, we will not presume that the suicide note—written more than six years after the murder and after *both* Sanchez Cortez and Romero had been charged with that murder—would have been particularly credible to a jury in light of the other evidence presented.

Consequently, Romero has failed to show "a reasonable probability of a more favorable outcome in the absence of the assertedly deficient performance." (*People v. Stewart* (2004) 33 Cal.4th 425, 459.)

### III.    DISPOSITION

The judgment is affirmed.

_____
              WILSON, J.

WE CONCUR:

_____
     LIE, Acting P. J.

_____
     CHUNG, J. *

*The People v. Romero; In re Jaime Demecio Romero on Habeas Corpus*
H053210, H053790

---

\* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.